Judge Robertson
delivered the opinion of the Court.
A paper purporting to be the last will and testament of Francis M‘Daniel, dated 17th July, 1826, having been offered to the county court of Harrison, for probate, by William Tucker, who was nominated the executor, was rejected, on the ground that, in the opinion of the court, the testator had not a disposing mind.
Jane, Joseph and Alsev, who were the slaves of Francis M‘Daniel, and whom the rejected paper will emancipate, if it be established as his will, have, with the leave of this court, prosecuted a writ of error as paupers, to reverse the judgment of the county court.
The proof of the execution of the instrument, con-formably to the forms and ceremonies required by *332 law, being perfectly satisfactory and uncontradicted, the only question to.be considered, is the capacity of F. M‘Paniel to. make a will.
Executor, having no other interest than his fiduciary character imparts to him, is competent witness to prove the will.
Witness cannot, by his own act, alter knowledge of a fact, de-stoy his competency.
The right of the plaintiffs to prosecute a writ of error, was contested, but was frankly admitted on an examination of the case of Wells’s will, in V. Li it. Reports, 273.
Before \ye proceed to an investigation of the facts, bearing on the main question, it will be proper to dispose of a preliminary point. William Tucker, (named as executor,) was offered as a witness, by the plaintiffs. His competency was denied by the counsel for the defendants, on two grounds. 1st. Because the office of executor is supposed to be so far valuable and desireable, as to create in W. Tucker, the influence of pecuniary interest in the event of this case* 2d. Because the county court rendered a judgment against W. Tucker, for costs, which the counsel suppose a reversal of the order rejecting the will, will also reverse.
An executor who has no interest in the residuary-fund, and no other interest than that of a fiduciary, is a competent witness to prove the will, whereby his appointment is initiated. I. Philips on evidence, 433^ I. Mod. 1Q7, Many other authorities, both British and American, might be cited in confirmation of these, but it is deemed unnecessary, to multiply references. Nor is it necessary to employ argument, to illustrate a doctrine which is well established by the authority of law, fortified by reason and analogy.
Whether the judgment for costs could be reversed in this case, as Tucker is not a party, and has not complained, would be a question somewhat perplexing, if it were necessary to decide it. But we shall express no opinion now upon it, as it is our opinion that Tucker is competent, even if the judgment for costs against him, shall depend, directly or virtually, on the. affirmance or reversal of the order rejecting the document claimed by plaintiffs to be a good will. If, in consequence of the judgment against him for costs, Tucker now has any interest in this case, that interest was acquired voluntarily by him, since the *333 plaintiffs bad a right to the benefit of his testimony. No rule of law is more rational or just, than that which will not allow a witness, once competent, to deprive the party in whose favor his testimony would operate, of a right to it, by rendering himself incompetent. A witness, after he shall have obtained a knowledge of a fact, cannot, by his own act, destroy his competency to prove it. If he could, fraud and injustice, without limit, might be the consequence.
But the rule extends no farther than the reason and policy of it require. And consequently, a witness may be rendered incompetent by acquiring an interest in the event of the suit, without his own voluntary agency; as when the interest devolves on him by operation of law, or by any accident happening, without his agency, or which he could not have controlled.
If Tucker have any interest in this case, it has been acquired since the plaintiffs had an interest in his testimony, and a legal right to it; and it has not been vested in him, by mere operation of law, nor by any accident which he could not have averted, or which could have occurred without his own voluntary act. He made himself a party in the county court. The paper might have been offered for profert, as a will, by any person who was interested in establishing it. It was not necessary for him to offer it, and make himself a party to the contest in the county court. His doing so, seems to have been perfectly voluntary. There is no evidence that what he did, was done at the instance, or with the knowledge or consent of the plaintiffs. Whether, therefore, the judgment for costs be right or wrong, he brought it on himself. It was the consequence of his own act, and the plaintiffs must not suffer by it. It would be an idle waste of time to array the numerous authorities on this subject. It is enough that we do not doubt that they secure to the plaintiffs the right to the testimony of William Tucker; and, therefore, he was admitted and heard, as a competent witness in their behalf.
Sixteen witnesses were sworn and examined, as to the capacity of Francis M’Daniel. Four of these were for the plaintiffs, and nine were for the defendants. Three physicians were also sworn. The *334 three subscribing witnesses and William Tucker, who wrote the instrument, swore that they had no doubt that M’Daniel had a disposing mind, and had a perfect knowledge of what he did, when he acknowledged the paper purporting to be his will; and from their testimony the following facts appeared: That M’Daniel was about sixty years of age when the will was acknowledged; that he died in the winter 1829; that about four years before his death, he was stricken down with a paralytic stroke; that the paralysis was general, and disabled him so much, that he was unable to walk about, and was confined to his house, and generally to his bed; that his articulation was very indistinct, sometimes inaudible, and sometimes unintelligible to those who were not frequently with him; that his mind was, in some degree, benumbed, but was generally rational and sound; that on the 16th of' July, 1826, one of his daughters was married against his will; that, on the morning succeeding the marriage, whilst several of those who had been invited to the wedding, remained at his house, he sent for Samuel Tucker, and communicated to him his wish then to make a will, and directed that William Tucker, who was a near neighbor, and a Methodist preacher, should be sent for to write the will; that he was instantly sent for, and came, when M’Daniel requested him to draw the will, and told him how he desired it to be drawn; he stated then, that he had made advancements to some of his children, memoranda of which he had preserved in a book, which had been lost or stolen; he suspected one of his sons for taking it; but he told Tucker that he retained a perfect recollection of the amount of each advancement, and directed him to set them all down, as he did, in the will, as they were respectively stated by him. It appears, by other testimony, that advancements had been made to some of the children. M'Daniel directed Tucker to require of one of his sons the payment of interest on the price of some land which he had given him, and stated the sum which was due. The will was written precisely as he dictated. After the advancements had been inserted, he stated that it was his wish to manumit his three slaves, but that he desired to consult some of his sons about it, as he *335 would be unwilling to displease his family; some of the sons were called in, and being informed of old man’s wish, replied, that they hoped that he would do as he pleased, “that his will was their pleasure.” He then directed Tucker’to insert a provision for the emancipation of the slaves, at his death; his wife had requested, on her death bed, that, at his death, the female slave, (the mother of the other two) should be liberated. There was no secrecy nor attempt at concealment in writing the will; some of the' family and others were occasionally in the room. The testator was clearly understood; there was no attempt to control or dictate to him; he spoke slowly, and was sometimes asked what he meant, which he would explain intelligibly. The witnesses for the defendants swore, that it was their opinion that the testator had not a disposing mind; that his mind appeared to be as much affected by the paralysis, as his body; that his articulation was unintelligible generally; that he seemed to be incoherent and flighty; that on one or two occasions, he did not recognize some of them who were his intimate acquaintances; that he had been, before his affliction, fond of reading, but that during his confinement, never manifested any inclination to read, or any concern for his temporal business; that sometimes, when he would attempt to converse, and would b¿ unable to do so intelligibly, he would become irritated, and say that he was foolish, and could not say what he intended, that his head run round like a millstone; that he was rarely out of his bed; that his tongue and limbs were very much paralysed, but that his greatest suffering was in his head, as he signified frequently, by putting his hand to his head, when asked where his severest pain was; that his mind was uncommonly vigorous before the visitation of the palsy; that he had frequently said that he would never make a will, because the law made a just distribution, and that he had been uniformly opposed to emancipation.
The foregoing is a synopsis of the evidence of the thirteen witnesses from Harrison.
In addition to these witnesses, Doctors Major Wilkinson and Roberts were sworn; the two former *336 stated that it was their opinion that in a general paralysis, the mind would be as much or nearly as much disabled as the body; the latter thought otherwise, and expressed the opinion that the testator might have been able to make a will.
What is a disposing mind, must be ascertained, more by the facts of each case, than by any comprehensive definition.
A survey of all the facts, may authorize a diversity of opinion as to the state of the testator’s mind, and the degree of capacity which he retained. That his faculties were, in some degree, impaired, ought not to be doubted. His mind was more feeble and passive than it had been when his body was in health and vigor. An habitual quiescence and an occasional torpor, which are peculiar to such a physical prostration, and invariably result from it, in some degree, characterized the mind of M’Daniel. But was there such a prostration or alienation of intellect, as to incapacitate him to make a will1! A correct answer may be somewhat difficult.. But after a full and careful consideration of all the facts, we have come to the conclusion, that he had a disposing mind.
The testimony, when scrutinized, is not necessarily contradictory. In numbers, the defendants have a great advantage. But this is more than counterbalanced by the nature and the intrinsic weight of the facts which are opposed to it. The witnesses are all credible and intelligent. They all swore to what they believed, and to nothing more nor less, as we feel authorized to infer, from their characters and deportment. But the facts affiimed by the witnesses for the will, cannot be true; if their opinion of M*Daniel’s mind was incorrect, all the facts stated by the opposing witnesses maybe true, and still their deductions from them may be delusive. If M’Daniel had not a disposing mind, William Tucker and the subscribing witnesses swore falsely, with design and with a full knowledge that what they swore was false. If he had a disposing mind, the witnesses for the defendants swore to nothing which should subject them to the imputation or suspicion of perjury. Every fact stated by them, or either of them, may be admitted, without conceding the insanity of M’Daniel’s mind.
Opinions of witnesses, not entitled to much weight in will casés.
'This decisive consideration will be manifested by an analysis of the evidence. We will not recapitulate and collate the facts; the substance of them has been stated.
The opinions of witnesses are not entitled to much influence in such a case as this. The facts from which the opinion's are deduced are more decisive;
The reasons assigned by the witnesses for the plaintiffs, would, unopposed, have left no doubt of the capacity of M'Daniel to make a will, even if the witnesses had expressed no opinion to that effect. The facts, without the opinion, are incomparably better than the opinion without the facts. Are the facts true? They must be admitted to be so, because the witnesses are credible, and had no motive [to pervert or misrepresent, or conceal the truth. Sanity of the testator, is the necessary consequence.
The facts on the other side, are not inconsistent with those proved b.y the witnesses for the plaintiffs-. They may be, and we do not doubt are, all true-. But those established by the witnesses for the defendants, do not necessarily contradict those proved by the Witnesses for( the plaintiffs, nor so unavoidably lead to the opinion which has been founded upon them;
It may be true, that the testator sometimes, when suddenly awoke, or roused, from a momentary stupor, did not know the names of some of his neighbors; and still he may not have been insane, or if he were incompetent to make a valid will, at those moments, he might have been competent, when Tucker drew the one now under consideration. It may be true that some of those who saw him, could not understand what he attempted to utter; and, nevertheless, he may not have been insane, unless the mind can never conceive what the tongue will not utter; and so every other fact stated for the defendants, may be reconciled with a disposing mind. M‘Daniehdid not read, because it was -physically impossible to do it.
But it cannot be true, that the testator knew how-to dictate every provision in the will; recollected the amounts advanced to his children; remembered that his wife requested him to liberate the old negro *338 woman; and acted and conversed, not only when the will "was drawn, but generally, as was proved by the plaintiffs, unless he had a disposing mind; and it is not unworthy of consideration, that almost the only circumstance which induced the opinion of his incapacity, was, that he was unable to talk intelligibly to those who have expressed that opinion. And they have proved facts, which tend to'shew, that, whenever they were able to undesrtand what he said, he understood himself perfectly. Their opinion uncontradicted by any opposing opinion or fact, would have invalidated the will, when explained by the facts on which it is founded, its effects would have been so much diminished, that doubt would have been the consequence. But all perplexing doubt vanishes, when the facts on the other side appear.
Paralysis however uni-versa), does not always affect the mind equally with the body.
^Therefore, the will must be established, unless the disease, with which the testator was afflicted, be of such a character, as to shew that it was impossible, or greatly improbable, that he could have had a disposing mind, at any time after its first shock.
How much sover, the muscular and nervous system may have been affected, it is hardly possible that the mind could have bpen paralysed in an equal degree; for if it had been, it was scarcely possible, as it seems to us, that he could have lived four years. And we are vei’y sure that he could never have reasoned on any thing, or remembered any thing, as all the testimony for the defendants coincides, that he sometimes did.
We cannot admit that a paralysis, however universally it may pervade the system, affects the mind equally with the body. It could not do so unless the mind were material.
The mind derives its aliment from the body, through the senses; whilst any one sense remains, the mind can act rationally.
The destruction of all the senses is death. No one of M‘Daniels’s senses was destroyed; some of them as hearing and seeing, were not impaired. He lived four years. He must in this interval, have had mind and reason enough, to dispose, prudently, of his estate* *339 At least, the paralysis of the body, is irreconcilable with the reasoning faculty of the mind. We will not attemptany display of learning, on a subject, which the most experienced and erudite understand but very imperfectly. The nature of mind, and its mysterious connexion with matter, are equally incomprehensible. We know something of the organization of the one, and of the phenomina of the other. But how, or to what extent a paralysis of the corporeal, operates on the intellectual man, no speculation can ever explain. Experience is the only in-structer on this subject; and her lessons are not perfectly satisfactory. They prove, however, that the soundness and energy of the body are not always sure criteria of the sanity and force of the mind; and they prove also, that many whose bodies have been prostrated by the most invincible lingering paralysis, have still, in their physical desolation, enjoyed the light of reason, and been consoled and sustained, “by the hope beyond the grave.'" In this truth, experimental and speculative philosophy, harmonise. As long as the body retains sensibility, the mind which animates it, may remain sound. A paralysis does not destroy sensation. It impairs muscular power; and prevents the organs of the body from obeying, implicitly, the will of the mind. It affects the mind in some degree, of course; but its ravages do not prostrate the action of mind and body in the same degree. The faculties of each do not sink uin pari passu." That which is immaterial and self evident, and which reasons, and thinks, and lives forever, does not always slumber, when the body is powerless. It may be sane, though occasionally lethargic. It may be sound and active, when the tongue, and the hand, and the eye, are incapable of motion; and many conceive and will, what they refuse to execute.
But McDaniel’s tongue still spoke, and intelligibly, to those who were often with him. In all his conduct he evinced the exercise of a rational mind, and no witness proved one single act or word, in the four years. which indicated settled deranghnent of mind; all of them, proved acts and expressions, which could be the offspring of no other than a sound mind; although it might be and no doubt was somewhat impaired.
Rationality and equality in a will, made fully ■without dictation, conclusive of sanity.
Mills and Brown, for the will; Crittenden and John Ifrimble, against it,
None of the children opposed the making of the will. It was made publicly, and with the knowledge and approval of several of them. It was just and equal in its provisions, after liberating the slaves, it distributes the estate equally; it displays reason, and memory, and benevolence. It was the plan of the testator’s own mind, uninfluenced by the advice or dictation of any other. That mind must have been rational. We cannot, therefore, refuse to permit its will tobe carried info effect. We know of no case, in which, under similar circumstances, a will has been set aside. Many have been established on facts, more questionable, in our opinion, than those in this case.
Wherefore, the order of the county court, refusing to admit the will of Francis M‘Daniel to record, is reversed, and set aside; the will ordered to be recorded here, as fully proved; and a certified copy transmitted to the county court of Harrison, with instructions to admit it to record there, as a will, recorded here, on full proof.