The Chief Justice

delivered the Opinion of the Court
George Weir, of Woodford, when singularly agitated on the subject of religion, and with a fixed foreboding of speedy death, though apparently free from physical infirmity and disease, wrote, in his usually free and legible hand, the following paper; which was afterwards, on the morning of the 26th of September, 1839, attested by Joseph C. Stiles, at his instance, and in his presence, at his own house, and thus published as his last will:—
“ I, George Weir, being of sound mind and memory, “ do make this instrument my last will and testament, to “wit: I devise all my real and personal property, with “ the exception of my negroes, to my dear and beloved “wife, Anne Elizabeth Weir, and my children, one' “ named John William Weir, and the other named Mary “Dobbin Weir, to be equally divided amongst them, “ subject to the following exceptions, to wit: Jane Dob“bin and Mary Dobbin are to have one thousand dollars ‘c each, to be paid them two years after my decease, I “also leave George Carroll, grandon of Thomas Car- ‘‘ roll, fifteen hundred dollars, which is in part to be appropriated to his education; the’balance to be given “him when he becomes' of age, to make a start in the “ world, I wish him to have a good moral and religious *435 " education, and to reside in some religious family who "will provide him with moral and religious instruction. "With respect to my negroes, I wish them to be hired " out for, say two years from my decease, at the end of “ which time the proceeds of such hire shall be given or ‘ ‘ divided between them, and each and every one of c ‘ them be set at liberty, and placed, or directed to be "placed, in such situation as may be thought most advisable by my administrators. And I beg that my be- " loved wife will throw no hindrance in the way of such " arrangement in respect to the negroes. All my real "estate and personal property, with the exception of the "said negroes, I wish to be sold and appropriated to the "purposes designated herein. And I do hereby appoint "James Weir, Anne E. Weir, and J. C. Stiles, as my " administrators, to carry this my last will and testament " into effect. Given under [my hand, this 24th September, 1839.”
Rejection of the will in the county court; & question here-whether the testator was of disposing mind.
The evidence in this Court.
Attest. Geo. Weir.

Joseph C. Stiles,

‘ T do also say herein, that old Mrs. Garroll is to have $500 for her own use.” G. Weir.
Codicil — "There will be deducted out of my estate, ‘ ‘ means sufficient to pay debts incurred in liberating my " negroes, and my heirs shall not be entitled to the pro- " vision made for them, unless they shall go security to " Court for said negroes’ good behaviour.”
Attest, Jos. C. Stiles.
Weir having died on the 12th of November, 1839, the foregoing paper was presented to the County Court of Woodford, for probate; but the Court, consisting of eight justices, being equally divided in opinion as to his capacity to make a valid will, rejection was the necessary consequence of that division.
The case having been re-tried in this Court, the only question to be decided, is whether George Weir, when he wrote the paper, had a disposing mind.
Several witnesses were examined on both sides, whose testimony, though circumstantially variant, was substantially the same in effect; and though they were about *436 equally divided in opinion as to Weir’s capacity to make a will, the facts which they proved, conduce, in our opinion, to the same general conclusion as to his actual condition and true state of mind,
The subscribing witness, an .eminent presbyterian preacher, living near George Weir, and, as both friend and pastor, associated with him in a manner peculiarly intimate and confidential, was clearly of the opinion that, though, as testified by him, in a very copious, intelligent and lucid manner, Weir, at and about the times of writing and publishing the paper, was in extreme mental agony, bordering on total despair and absorption on the subject of religion and his eternal destiny, yet, nevertheless, he was rational and of disposing mind.
And the facts proved by him, not essentially differing from those established by other witnesses, concerning the state of Weir’s mind about the same period, are substantially these: — that he owned five hundred acres of land, and about twenty slaves, and a valuable personal estate ; was actively engaged in agriculture, in manufacturing bagging, and in attending to a profitable mill on his farm; had manifested a very intense interest in his business, had been remarkably vigilant and provident in the constant supervision of it, in all its details; and had evinced an almost romantic devotion to his family, until some time in the spring of the year 1839, when, one of his children being dangerously sick, he became melancholy, and. afterwards continued to become apparently more and still more unconcerned about his family and estate, until about the date of the paper, when he had become, in a great degree, habitually passive, and inattentive to all worldly interests and relations, and seemed to be in a most deplorable condition of mental concentration and despondency, on the subject of religion. That, only a few days before the date of the paper, his wife, professing to be a Christian, was admitted into the presbyterian church, and that he, though then still in apparent despair, determined, as a last and forlorn hope, to become a member of the same church at the same time, and was accordingly received with her, but under circumstances which indicated intense conviction and distress, with *437 scarcely a gleam of Christian hope. That, the night preceding the attestation of the paper, Mr, Stiles remained with him, praying, instructing and encouraging; but he was sleepless and miserable, frequently exclaiming that he would soon certainly die; was a lost sinner; the “man of sin.” That, next morning, he brought the paper into the breakfasting room; told Mr. Styles that it was his will, and requested him to attest it; which was at first declined, because the witness thought the burthen of a last testament was injuriously oppressing his mind, and hoped that, if he could be induced to postpone the publication of it, and to get rid of the apprehension of almost immediate death, his mind would be much relieved; but he persisted, and the paper was attested. That he was indisposed to conversation on any other subject than religion ; but, when he could, for a moment, be drawn off to any other topic, he conversed as rationally and intelligently as he had ever done, though he appeared to feel but little interest in any thing else than his spiritual condition and approaching death, which seemed to haunt his mind almost constantly, and to abstract it, in a great degree, by a most potent and fatal spelt, from all things transient or temporal. And that he was so entirely under the dominion of this paralyzing conviction and hopelessness, that he was occasionally unwilling even to eat; and that, after the paper had been attested, he refused to sit at the breakfast table, but, being urged to eat, stood up and ate very sparingly and impatiently.
It appears that, the day after the publication, George Weir visited his brother James, near Lexington; told him that he had made his will, how he had made it, and why it had been so made, He also told him that he was in hopeless despair, and would .certainly die in a short time; manifested much anxiety about the emancipation of his slaves, and conversed.with him about the condition of his affairs, and the value of his estate; and that, about ten days afterwards, he handed to James Weir, an abstract of debts due to him, and from him, which had not been entered on his journal, and his recollection of which appears to have been singularly minute and accurate. This memorandum is as follows:—
*438 “ Woodford, October, — 1839.
‘'My Bill Book will show to whom I am indebted by note . and if any are not entered, all other notes out, of mine, are correct — I suppose. My a’c book has been very irregularly kept or posted, although all the credits I think would appear on them. But I now make a general statement of persons whom I owe on a’c, and those owing me at this time. ”
“H B Lewis, open a’c, owes me I think.
J W Daviss, do — I owe him for timber and negro work — and he owes me for 2 years sawing.
S T Twiman owes sawing a’c, and I owe him the notes in his hands — Sawing a’c settled,
P Fenwick flour-
George Tarleton do,
Wm French, as pr Book,
Wm Craig for flour, owes me,
L W Peak owes me — Bal on rye.
I owe Wm Martin for 100 B wheat at 75c pr, B. also a small bal, on hemp seed—
I owe H W Daviss a small a’c.
The Midway merchants I owe,
There is an unsettled a’c between myself J C Carlile—Jeans, Stove &c. Sawing a’c &c. deducted.
I owe none of the Harpers only on note. Tom Harper owes for plank
Edw. M Blackburn and Dr, C J Blackburn Scott have open a’cs, I owe Dr. C. of Scott I suppose $30 or $40 dollars. E M B..about even probably — other little flour a’cs Stevenson knows propably whether they have been collected.
All a’cs occuring from page 144 in day Book if paid off are marked settled or pd. those not pd off remain on Books in open a’c — Jno C Meguffins a’c is unsettled.
My a’cs in Lexington are with
A K Skillman, Porter & Butler.
Collins & Timberlake. Tom Huggins.
J Bruen. Mon & Cornwall.
A Logan. J S Marsh.
“ I Read & Son owe me, 8 or $9 00, see their a’c as closed. ”
‘‘ Henny ought to be set free,”
*439 James Weir arid others who saw his brother George during that visit, conversed with him on various subjects, arid believed that he was perfectly rational, though all of them noticed that he was so abstracted and perturbed by art engrossing contemplation of his destiny and the doctrines of religion, as to induce an apprehension that he might commit suicide, And James Weir believing that be would not for some time, be in such a condition as to be able to attend to his family and business, wrote a letter to his father-in-law at Louisville, requesting him to come, or send his son, to take care of his affairs.
It appears from other testimony, that, after he returned to his family he made entries on his Journal, allowing to two faithful managers, without solicitation by either of them, about fifty dollars each, more than his salary as fixed by contract, stating as his reason therefor; that they had been cheated, and deserved more than they had agreed to take; and, Suggesting that frauds had be'en generally committed in the measuring of Bagging, he required a re-mesuration of several pieces which he had on hand and even after they had been remeasured, seemed scarcely willing to believe the fact as reported by the measurer, that all of them Were as' long as they had been marked as being.
He continued to be' absorbed, and inattentive to his family and affairs j would sometimes seclude himself, and refuse to see his neighbors in his own house. But when any one called on business, he understood it perfectly, and attended to it correctly.
Dr. Blackburn, a neighbor and intimate friend, was of the opinion that, though he continued to Walk, and even' to increase in flesh, for some weeks after the publication, yet he was diseased both in body and mind, and was afflicted, at that time, with monomania, called by him “ melancholy mania, ” which disease continued to grow worse until he died; before which event, he was, according to all the testimony, evidently of unsound mind. Hr. Blackburn, however, did not see him about the date of his will, nor until about a week afterwards.
Such is a substantial outline of the material facts proved in this Court. And they certainly exhibit an anomaous case, in which, whatever may be the judicial deduc *440 tion as to the capacity of George Weir to make a will on the 24th of September, 1839, the candid and intelligent witnesses, who testified before us, and all of whom we're intimately acquainted with him, might reasonably differ in opinion on that important and difficult point.
Suggestion, that the proof of insanity-even without the countervailing evidence afforded by the will itself, the memo, of acc’ts &c. would not justify a decision against the validity of the will.
Religious impressions and apprehensions, producting extreme anxiety, even hopeless despair, caused by a conviction that the sufferer had 'passed his day of grace.' and so overwhelming as to render him unconcerned and listless on all other subjects-may exist consistently with unimpaired reason; and, of course, cannot justify the conclusion that, one affected, was incapable of making a rational and valid will. And if, when his attention can be diverted to other things, he is altogether rational & sensible as to them, it tends strongly to the conclusion that his mind is not unsound.
Had there been no attempt to make a will, or to exhibit a schedule of his unregistered accounts, although the question of sanity might have presented, in such a state of case, some metaphysical difficulty, yet we should not, even then, have been satisfied that George Weir was, at the date of the controverted paper, or for some days, perhaps weeks, afterwards, so far of unsound mind as to be incapable of making a prudent, rational and valid disposition of his estate.
The intensity of his conviction and despair on the subject of religion, without producing insanity, or being the consequence of it, might have rendered him listless and unconcerned on all other subjects, and have been, nevertheless perfectly consistent with the existence and the exercise of Unimpaired reason on all subjects. It would be difficult, and rather hazardous, to decide that his religious exercises, extraordinary as they may have been, would be the absence of any other facts, be satisfactory proof of insanity. His theological principles, and his views of the cardinal doctrines of the Christian system of religion were in the opinion of Mr. Stiles, altogether sound and orthordox. And therefore, -believing that he has passed hi day of grace, and was not in salvatable state, he might, without irrational delusion, or any disease of body or mind, have been in such agony of soul, as to feel that he could not long survive, and to manliest as he did, comparative unconcern for all things perishable. This was the opinion of Mr. Stiles; and could'not decide that he misconceived the true cause of the strange conduct which was ascribed by some others, to unsoundness of mind. Nor could we feel authorized to decide that, a high degree of enthusiasm, or .even fanaticism, on the subject of religion, should per se be deemed legal insanity. The fact, however, that, whenever he could be diverted into any other current of thought, he was as rational as he had ever been, tends strongly to *441 fee conclusion that his mind, though sometimes swallowed up in despair, was nevertheless not unsound or radically diseased,
That a will was altogether written—and written well, by the testator himself— making such disposition of his property, & such only, as is consistent with the affections, duties objects and principles, which he has always avow ed and professed when his sanity was unquestioned and unquestionable—is the best evidence that he was possessed of a disposing mind when he wrote it.
A memo. of facts and suggestions concerning the testator’s unsettled business, made out by him, for the ex’ors, after he had made his will, proving substantially correct, in all its numerous particulars,strengthens the conclusion resulting from the intrinsic propriety of the will itself.
But the manner in which he conceived and executed the purpose of making a will, and of preparing his business for the expected catastrophe which soon occurred, furnishes intrinsic evidence of his general sanity, or his capacity in reference to those matters at least, the force of which it would be difficult if not impossible for an intelligent mind to resist.
The best possible proof of a sound and disposing mind is “ a rational act, rationally done, ” which reason alone could have conceived and accomplished. There is no use for metaphysics then; nor should speculation perplex the judgment when the question is solved by the palpable fact, that rational intellect shows itself by acts which can be the offspring of no other than an intelligent, sound and reasoning mind.
Now, George Weir conceived and wrote his own will, without suggestion or aid from any other person. It seems, upon its face, to have been provident, just, and well considered. It was written with a clear and steady hand; the writing is free arid graceful, and the orthography is good. The memorandum afterwards prepared for James Weir, was written by the same hand, and exhibits the same general characteristics, though in an inferior degree; and all the minute facts therein communicated* turned out to be exactly true, with one exception only, and that is, that he owed William Martin for 102 bushels of wheat, instead of 100 as he thought.
The will is such an one as every just and enlightened mind would concur in approving as about the best a man, Standing in his relations, and being in principle an eman-fcipator, could have made.
He had promised, and was under a peculiar obligation, to make some provision for his two destitute and orphan. It was certainly his duty to make And he could not have been excused had he failed to *442 make any retribution to the aged grandmother who had nursed and reared that child. Nor, considering the value of his estate, could the sums bequeathed to each of those legatees be deemed exorbitant. Indeed they seem to be, in every way, suitable, proper, and just, and amounted in the aggregate, precisely to the estimated excess of the value of his personal estate, over the amount of his liabilities.
A testator, having made a will by which he devised the principal part of his estate to his wife and children, and directed that his slaves should be emancipated—added a codicil, a day or two afterwards, in which he says ‘my heirs shall not be entitled to the provision made for them, unless they shall go security to court for said negroes’ good behavior’: Held that the testator sho’d he understood as meaning, by the term heirs’ those to whom he had devised his estate; and, so understood, the codicil is not so absurd as clearly to indicate unsoundness of mind.
A testator, having made a will by which he emancipated all his slaves, afterwards made out a mem’o. which he delivered to one of his ex’rs, in which, among other things, he says: — “Henny ought to he set free:” tho’ Henny was a slave in his possession, as he was not the sole owner of her, and she wo’d therefore, not be free by the will, the memo, is no indication of insanity.
*442 Estimating his land, as he and his brother James both did, at about thirty thousand dollars — the provision made for his wife and her two infant children, was suitable and ample — especially as he directed the conversion of the land into money, for their use. And the directions given respecting his emancipated slaves, and George Carrol’s education, were thoughtful and prudent. Considering him an emancipator, it would be difficult to conceive for him a juster or wiser will.
His first codicil, written evidently a day or two after the body of the will, appears to be not altogether reasonable. But understanding him, as we do, to have used the word “Heirs” synonamously with legatees, intending thereby, those who were to succeed to his estate, we presume that his chief object was to induce his wife to confirm the emancipation of his slaves, by giving the security which he supposed the county court might require. The principal defect in this codicil, therefore, is only a want of legal skill and technical precision, which was not of such a character as clearly to indicate unsoundness of mind.
And when it is understood that he owned only a partial interest in the slave mentioned in the memorandum given to his brother James, the suggestion there made, that “ Horny ought to be set free, ” only tends to prove that he supposed, and truly, that his will emancipating all Ms slaves would not apply to her, and that therefore, he recommended her liberation also.
There is nothing, therefore, in the will or the memorandum, of a character so incongruous or absurd as to be entitled in our judgment, to any essential influence, towards impairing the intrinsic evidence of a disposing mind furnished by those documents ; which when scruti *443 nized and fully considered, must be felt as being so provident and rational, as to prove conclusively that the mind by which alone they were conceived and arranged, was perfectly sound and self-poised when they were executed. And we are satisfied, therefore, that, at the date of the will especially, there remains no substantial ground for a rational doubt that George Weir was of a disposing mind and memory.
When a lunatic writes his own will, in his natural manner, and the provisions of it are altogether sensible, proper and judicious, the will itself proves that, when he wrote it, he had a lucid interval.
Had the facts authorized the deduction that, before or about the date of the will, he had been oven a lunatic, the provisions of the will, combined with the fact that he dictated and wrote the whole of it, and in a manner so complete and judicious, ought to be sufficient to prove that, when he wrote 'it, he had a lucid interval. On this subject old Swinburne says — “If a lunatic person, or “ one that is beside himself at sometimes, but not con“tinually, make his testament, and it is not known “whether the same were made while he was of sound “ mind and memory or no, then, in case the testament “ be so conceived as thereby no argument of phrenzy or " folly can be gathered, it is to be presumed that the same “was made during the time of his calm and clear inter- “ mission, and so the testament shall be adjudged good: " yea, although it cannot be proved that the testator useth “to have any clear and quiet intermission at all; yet “nevertheless, I suppose that, if the testament be wisely “and orderly framed, the same ought to be accepted for “a lawful testament. ” And not only does this text contain both sound reason and good law, but its doctrine is still more conclusive when, as in this case, the testator actually wrote his will, and in such a manner as, of itself, to indicate self-possession, deliberation, and intelligence. We have seen no case in which a will supported by all those props, was ever set aside for incapacity, upon proof, however strong, as to occasional acts of evident insanity.
In the celebrated case of Cartwright vs. Cartwright, (1 Philmore, 90, and 1 Eng. Ecc. Rep. 47,) it was decided by Sir William Winn, that though Armyne Cartwright, when she published her will, was confined for lunacy, and considered by her attendant physician to be incapable of making a valid disposition of her estate, *444 yet, as she wrote her will herself, whilst alone, and in a manner, as to both mechanical execution and rational purpose, indicating the deliberate exercise of reason and right moral feeling, the will proved itself, and should be admitted as the valid testament of a person of sound mind at the instant of its publication. And in that case, among other things, he said — '“what can you do more to establish the act ? Because, suppose you are able to show the party did that which appears to be a rational act, and it his own act entirely, nothing is left to presumption in order to prove a lucid interval. Here is a rational act rationally dona. Now I think the strongest and best proof that can arise as to a lucid interval, is that which arises from the act itself.” And this decision was affirmed in 1795, on an appeal to the High Court of Delegates in England. It has been referred to, not as authority to which we should in all respects subscribe, but to. show to what extent enlightened courts have recognized and applied the principle laid down by Swinburne.
The case before us does not require the support of any such extreme case as that of Cartwright vs Cartwright, for here there was no sufficient proof of insanity before or about the time of writing Weir’s will. It is true that he lost his mind before his death, and that his condition was. never improved, but seemed to become gradually more marked and hopeless until he died. But this does not prove, or tend to prove, more than the fact that the ultimate cause of his moral ruin and his death may have existed, in his mind or his body, and perhaps in both, before he, wrote his will. But it does not authorize the deduction, repelled by other facts, that this incipient malady had progressed so far, or was of such a character, at the dale of the will, as to dethrone his reason, or incapacitate him for making a testamentary disposition of his estate. And whatever might have been thought of his strange forebodings had he been afterwards relieved of his melancholy and still survived, yet, as the event verified his predictions, his strong presentiments cannot be deemed evidences of insane delusion.
We are, therefore, satisfied that, at the date of his will and for some time afterwards, George Weir did not labor under general insanity,
Considerations upon the clause of George Weir’s will by which his slaves are emancipated; his opinions and views, as expressed, at various times, on the subject of slavery and emancipation, and upon his peculiar condition at the time when he wrote and published his will; and conclusion, upon all the facts and circumstances proved, that the Court is not authorized to decide, that the emancipation,— by a will written, wholly by him— and in all other respects (if not in that,) perfectly proper and discreet, is attributable to monomania, or any insane delusion, produced by the very extraordinary roligious excitement he was laboring under, at the time the will was made.
The more difficult question is — whether there was particular delusion degenerating into monomania; and whether this morbid affection produced or essentially modified his will, or any material provision thereof.
But we cannot decide that, at the date of his will, he was insane on the subject of religion, or in reference to his family or estate. We do not think that the facts authorize such a judicial deduction. In our opinion they conduce to a different conclusion.
Nor, if there had been such particular insanity at that time, could we decide that any provision in the will was influenced by it. The legacies to his nieces and natural son could not have been thus only produced; because he had made a will in 1834, in which he had made similar bequests; and moreover, they were obviously natural and reasonable. The small legacy to old Mrs. Carrol was equally so ; and the devise to his wife and children was suitable, ample and reasonable, upon the hypothesis that he acted rationally in manumitting his slaves. Whether any morbid delusion, amounting to insanity, on the subject of religion or social obligation, influenced him to emancipate his slaves, is the only question about which we have felt any difficulty.
It appears that he had expressed the opinion that those who emancipate their slaves and leave them in-a slave State, thereby do an injury to the persons liberated, and great injustice to the resident white population; and it appears, also, that, as late as August, 1839, he offered to buy a slave or slaves at auction in his neighborhood. But his brother James testified that he (George) had always been opposed in principle to slavery, and that he had, in the winter of 1838-9, evinced to him, in a confidential conversation, that he considered it his duty not to die a slave holder. It seems, therefore, that, though he was willing to use slave labor and own slaves in a slave state, he was, in principle, an emancipator, and intended, when his capacity was unquestioned, to liberate his slaves at his death. And though he may have felt rightly as to the impolicy of 'letting loose, in the bosom of a slave community,"a degraded cast of manumitted negroes, yet his will does not show that he had changed that *446 sentiment, or had forgotten his duty on that subject, for he confided the disposition of his emancipated slaves to the discretion of his brother and Mr. Stiles, who knew his own feelings and opinions as to what would probably be the best disposition of them as to residence and society.
Short summary of the reasons for deciding that the testator in this case, was not incompetent, but was of a sound and disposing mind, when the will was made.
In emancipating his slaves, therefore, we cannot presume that he did otherwise than he had deliberately intended when his sanity was unquestionable.
Nor can we decide that his conduct in the measuring of his bagging, and in giving to his managers more than their stipulated salaries, manifested an insane delusion on the subject of Christian duty. It only proves that his religious convictions had become such as to awaken a peculiar sensibility to scrupulous justice and truth.
And were it admitted that his deep and peculiar feelings on the subject of religion, produced all those manifestations of benevolence towards his fellow citizens, and also towards his slaves, still we could not say that therefore he was, even on that subject, insane.
We are therefore of the opinion that, there is no sufficient proof of particular delusion, or of any such insanity having influenced the will, to authorize this Court to adjudge it invalid for want of a sufficiently sound and disposing mind at the time it was written and published.
And, as already suggested, we are clearly of the opinion that George Weir’s capacity to settle his accounts, and to converse rationally whenever he chose to do so, and the intelligent manner in which he framed and wrote his own will, the propriety of its provisions, and their perfect conformity with right moral sentiments, with his own deliberate and pre-formed determinations, and with all his relative duties, prove that, when he wrote and published it, he had a sound and disposing mind.
Then, whatever may be the effect of the emancipation of his slaves, as he had a right to liberate them, it is the province of this Court to pronounce the law, and establish his will.
Wherefore, the order of the County Court is set aside, and the paper purporting to be the last will of George Weir, deceased, is admitted to record in this Court, as *447 his true last will and testament, and ordered to be certified to the County Court of Woodford, with instructions to admit it to record as such also in that Court.