WILLIAM HANNANT *et al.* Appellees, *vs.* NELLIE A. PEN-
STONE, Exrx., Appellant.

*Opinion filed October 26, 1912.*

1. WILLS—*when issue of undue influence should be taken from
jury.* The issue of undue influence in a will contest case should
be taken from the jury, at the request of the defendants, where
there is no evidence fairly tending to show, or even to raise a
fair inference, that the will was executed as the result of any im-
proper influence by the beneficiary or anyone acting for her.

2. SAME—*verdict and decree must be set aside if clearly con-
trary to weight of evidence.* If the verdict and decree upon the
issue of want of testamentary capacity in a will contest case are
clearly contrary to the weight of the evidence it is the duty of the
Supreme Court to set them aside.

3. SAME—*when the opinions of witnesses are of little weight.*
Opinions of witnesses as to the incompetency of the testatrix are
entitled to but little weight when opposed to clear proof of facts
showing that at the time referred to by the witnesses she was un-
derstandingly transacting business.

4. SAME—*a holographic will is presumed to have been executed
voluntarily.* A holographic will in the handwriting of the testa-
trix is presumed, until the contrary is established by proof, to have
been executed by her voluntarily and without aid.

5. SAME—*when a holographic will establishes testamentary ca-
pacity.* A holographic will which is rational upon its face and
which disposes of the property in a rational way and in accord-
ance with the existing facts and circumstances surrounding the
testatrix at the time of its execution, establishes, of itself, testa-
mentary capacity.

6. SAME—*fact that testatrix committed suicide does not estab-
lish a want of testamentary capacity.* The fact that the testatrix,
more than a year after executing her will, committed suicide, does
not tend to establish a want of testamentary capacity, where it is
shown that she made deeds and received conveyances and trans-
acted other business continuously, almost up to time of her death.

APPEAL from the Circuit Court of Pike county; the
Hon. HARRY HIGBEE, Judge, presiding.

ANDERSON & MATTHEWS, and WILLIAM MUMFORD, for
appellant.

W. E. WILLIAMS, A. CLAY WILLIAMS, and L. T. GRA-HAM, for appellees.

Mr. JUSTICE HAND delivered the opinion of the court:

This was a bill in chancery filed by the heirs-at-law of Rebecca E. Wilson, deceased, against Nellie A. Penstone, individually and as executrix, to set aside the probate of the last will and testament of said Rebecca E. Wilson on the ground of undue influence and want of mental capacity to make a will. An answer and replication were filed and issues of fact were made up and submitted to a jury, which upon a second trial resulted in a finding by the jury against the will, and the court, after overruling a motion for a new trial, entered a decree in accordance with the findings of the jury, from which decree this appeal has been prosecuted.

The facts, in brief, are as follows: The testatrix was of English birth. In 1858 she married one Henry Edom, by whom she had one child. Her husband and child having died, she left Pike county, Illinois, where she had lived for many years, and went to St. Louis, Missouri, where she soon entered the employment of Henry Shaw, the founder of Shaw's Garden, in that city. She soon disclosed good business and executive ability, and Mr. Shaw, after a time, placed the management of his household affairs, which were large, exclusively in her hands. She remained in that situation for a period of something like twenty years and until the death of Mr. Shaw, which occurred late in the eighties. By his will Mr. Shaw gave her real estate in fee and the life use of other real property located in the city of St. Louis, which netted her an income, all told, of about $250 per month. Subsequent to the death of Mr. Shaw she married Henry Wilson, with whom she resided in St. Louis for a time. In the year 1905 she and her husband returned to Pike county, Illinois, and Mrs. Wilson purchased a home in Pittsfield for $3500, which she remodeled and in which

she and her husband lived until his death, which occurred some two or three years prior to her death. After the death of Mr. Wilson it was arranged that Nellie Penstone, the appellant, should make her home with Mrs. Wilson, which she did until the death of Mrs. Wilson, which occurred by suicide on the 29th day of August, 1908. At the time of Mrs. Wilson's death she owned absolutely about $7000 worth of property, mostly real estate. On May 10, 1907, Mrs. Wilson executed a holographic will in words and figures as follows:

"PITTSFIELD, ILLINOIS, *May 1st, 1907.*

"I, Rebecca Edom Wilson, Being in good health sound in body. First all my honest debts must be paid then I wish to give to my Neace Nellie A. Penstone all my property real personal and mixed should she die before me then it goes to another Neice Ada Hannant Vose. Nellie A. Penstone is not to give bond but to have control of all and to do as she sees fit. This is my last Will.

REBECCA EDOM WILSON.

"We, the undersigned witnesses, signed the foregoing instrument at the request of the testatrix, who declared the same to be her last will and testament, and she acknowledged the foregoing to be her signature. We signed the same in the presence of the testatrix and in the presence of each other.—May 10th, 1907.

EDWD. DOOCY,
JOHN R. GICKER."

The probate of said will was denied in the county court of Pike county, where it was filed, but it was admitted to probate and ordered recorded as the last will and testament of Rebecca E. Wilson, deceased, by the circuit court of said county.

A large number of witnesses were sworn and testified on the trial of this cause, and, as is usual in this class of cases, there is a conflict in the testimony of the witnesses upon the question of the ability of Mrs. Wilson to intelligently and rationally execute a will. On the other issue in the case,—that is, the issue of undue influence,—there is but little conflict, if any, in the evidence found in the record bearing upon the execution of the will.

Mrs. Wilson, presumably on the first day of May, as that is the day the same bears date, wrote her will. On the tenth Nellie Penstone requested Edward Doocy, an ex-judge of the county court of Pike county and a neighbor and friend of Mrs. Wilson, to get another witness and call at the home of Mrs. Wilson and witness a document which Mrs. Wilson wished to execute. On that day Judge Doocy called with John R. Gicker, an ex-county clerk of Pike county. Mrs. Wilson, after receiving Judge Doocy and being formally introduced to Mr. Gicker, with whom she was not personally acquainted, produced the paper afterwards admitted to probate as her will and inquired of the judge if it was necessary that the witnesses to a will should know the contents of the will. He informed her it was not,—that all they would desire to know was that the instrument they witnessed was a will. She then stated the instrument which she held in her hand was her will and that she desired them to sign the same as witnesses. The instrument had theretofore been signed by her. Judge Doocy then wrote an attestation clause beneath her signature and they both signed the will in her presence and it was returned to her. In a short time, in response to a telephone call, Giles Penstone, the father of Nellie Penstone, called at Mrs. Wilson's house and she handed him a sealed envelope and stated to him that it contained her will and that it was in favor of Nellie, and asked him to place the same in the bank in Pittsfield where she kept her account. Mr. Penstone took the will to the bank and placed it in his private box, where it remained until after Mrs. Wilson's death, when he presented the will to the county court for probate.

Mr. Penstone was a neighbor and friend of Mrs. Wilson. His daughter was her friend and companion, and we find no support in the evidence for the view that the will which was executed by Mrs. Wilson and subsequently admitted to probate was the result of the improper conduct of

Mr. Penstone or his daughter. Mr. Penstone very frequently assisted Mrs. Wilson in the transaction of her business matters, and Nellie Penstone was the only other person at Mrs. Wilson's home, so far as this record shows, except the servant girl. Mrs. Wilson was therefore forced to accept their services in executing her will and caring for it after its execution or to forego the right to make a holographic will.

It appears there had been some talk, before the execution of the will, between Mrs. Wilson and Mr. Penstone as to the execution of a will by Mrs. Wilson, and that Mr. Penstone stated to her that Judge Orr said she ought to make a will; and again, that if she wanted to make a will he would have Col. Matthews, who was her attorney and friend, come and see her. In reply to these suggestions she stated that if Judge Orr would attend to his business she would attend to hers, or words to that effect, and that she would not pay Col. Matthews five dollars to draw her will as she was competent to draw her own will, so nothing ever came from the suggestion of Judge Orr or the offer of Mr. Penstone to call Col. Matthews.

We are of the opinion there was no evidence introduced before the jury on the trial of this case which fairly tended to show, or even to raise a fair inference, that the execution of the instrument admitted to probate as the will of Mrs. Wilson was executed as the result of the improper influence of Nellie Penstone or her father over Mrs. Wilson. We think, therefore, the trial court should have eliminated that feature of the case from the consideration of the jury by peremptorily instructing the jury, as the court was asked to do, that the evidence did not tend to support the charge of undue influence.

The evidence on the question of the mental capacity of Mrs. Wilson on May 10, 1907, to execute the will in question, as heretofore stated, is conflicting, and ordinarily this court would not, in that condition of the record, disturb the

verdict of the jury or the decree of the trial court based upon that verdict. If, however, this court can say that the verdict, and the decree based thereon, are manifestly against the weight of the evidence, as we are of the opinion they are in this case, the verdict of the jury and the decree of the court will be set aside and annulled.

Mrs. Wilson was admittedly a cultured and strong-minded woman and for many years had conducted successfully and satisfactorily a large establishment in the city of St. Louis. After the death of Mr. Shaw, who was the owner of that establishment, she managed her property successfully down to the time of her death, collecting her rents and disposing of them as she saw fit. In 1905 she purchased a home in Pittsfield and remodeled it. The purchase price and repairs were paid from her rent income. Subsequently thereto she sold the property in St. Louis which Mr. Shaw had devised to her in fee, for $10,000, and disbursed the proceeds in the payment of mortgages and other liens and placed the balance to her credit in her bank at Pittsfield. After she and her husband returned to Pike county many elaborate entertainments were given at the Wilson home, to which were invited the élite of Pittsfield, and up to the time of her death Mrs. Wilson was called upon by the ladies of Pittsfield and returned their social calls. She was a fine card player and an interesting conversationalist, and up to the time of her death attended church and was recognized by all as worthy of their confidence and esteem, although during that time her health seems to have been somewhat impaired, which lessened her social activities. During the last sixteen months of her life she did her own business, collected her rents, made deposits in her bank, drew checks upon her account and saved from her income the sum of $1600, which was on deposit in her bank at the time of her death. These facts are not in dispute and tend strongly to establish the mental capacity of the testatrix. In *Graham* v. *Deuterman*, 217 Ill. 235, it

was held that opinions of witnesses as to incompetency are worth but little when opposed by clear proof that at the very time referred to by the witnesses the testator was understandingly transacting business and that he voluntarily and intelligently made his will, and the fact that this will is a holographic will tends very strongly, we think, to show that Mrs. Wilson was rational at the time she executed the same. There is no evidence in this record that any other person had any office in its execution. It is in her handwriting, and we think the presumption must obtain that she executed it voluntarily and unaided, until the contrary is shown. The authorities are well-nigh of one view that a holographic will which is rational upon its face and in accord with the existing facts which surrounded the testator at the time of its execution, establishes, within itself, testamentary capacity. (*Spratt* v. *Spratt,* 76 Mich. 384; *Kingsbury* v. *Whitaker,* 32 La. Ann. 1055; *Wier's will,* 9 Dana, 434; 1 Underhill on Wills, 136; 1 Clevenger on Medical Jurisprudence of Insanity, 324.) True, as suggested by appellees, if a pauper lunatic should execute a holographic will in which he disposed of millions to the imaginary objects of his bounty, while the will might be rational upon its face it would be destroyed by the facts which surrounded the testator. This might be true, but the illustration is not in point as applied to this case, as here the estate was not large and the beneficiary was the friend and companion of the testatrix. The will is rational upon its face, and there is nothing irrational in the gift of her entire estate by the testatrix to her friend and companion. In *Spratt* v. *Spratt, supra,* it was said: "But what weight is opinion evidence entitled to where it appears that, unaided by anyone, he does, in fact, make a will disposing of all his property?" And again: "When, in the absence of fraud or undue influence, it is shown that the testator either wrote or dictated the will produced, the fact is established that he was capable, mentally and physically, of doing

whatever the instrument shows was done, and the only question is, does the instrument on its face indicate that it is the emanation of an unsound mind, when applied to the facts and circumstances upon which and under which it was intended to operate, namely, the estate disposed of and the manner of disposition?"   And in the *Kingsbury case* it was said: "When the will is established to have been made by the testator himself, unaided by others, and when its provisions and expressions are sage and judicious, containing nothing 'sounding to folly,' these facts establish a presumption, even in the case of persons habitually insane, that it was made during the existence of a lucid interval, and impose upon those who attack the will the burden of proving insanity at the moment when it was made."

We are of the opinion that the evidence of the proponent, standing alone, clearly established the validity of the will.   The question then presents itself, does the evidence of the contestants overcome this evidence with such probative force as to sustain the verdict of the jury and the decree of the trial court?

It is clear from the evidence that the death of Mr. Shaw was a great shock to Mrs. Wilson and that she never fully recovered therefrom.   That after her second marriage, which was not, perhaps, a wise or happy one, she was afflicted with the melancholy which for a few months subsequent to Mr. Shaw's death clouded her mind but that she soon recovered her ability to do business and to make a will and dispose of her property by will, we think there can be no doubt upon the evidence found in this record. The witnesses who declared her to have been insane at the date the will was made rely largely upon the fact that she said but little and when people called upon her or met her she did not talk.   For a number of years prior to her death she was very deaf, which would excuse that apparent inattention.   Other witnesses spoke of the fact that she often said she had but little to eat and had nothing to wear,

when she was well provided for. At such times she was, perhaps, comparing her present condition to the times when she presided over the Shaw mansion as housekeeper. Other witnesses referred to the fact that she desired to go upon a railway journey on two occasions when not properly dressed for such a journey, while others say she ceased to be neat in her personal appearance and did not comb her hair and properly bathe her person or cleanse her teeth. None of these facts, if true, necessarily show mental incapacity or controvert that she rationally transacted her business, cared for her property, saved $100 a month from her income during the last sixteen months prior to her death, and could rationally and intelligently make a valid will. It is also doubtless true that the fact that Mrs. Wilson hanged herself may have influenced the witnesses in their opinions as to her sanity and the jury in the conclusion at which they arrived in determining the question of her insanity.

From a careful examination of this entire record we are impressed with the view that the testatrix was at times, perhaps, not capable of making a deed or a will, but that at other times she was fully competent to transact business and to make a will. She did make deeds conveying valuable properties and received conveyances conveying to her valuable properties almost up to the time of her death, and during the period subsequent to her husband's death engaged continuously in transacting business. We are therefore impressed with the view that she had sufficient mental capacity to make a will on May 10, 1907, from the fact that she did make a will on that day which was rational upon its face and which disposed of her property in a rational way,—in other words, that the evidence does not sustain the verdict of the jury and the decree of the circuit court setting aside the judgment admitting the will of Rebecca E. Wilson, deceased, to probate.

The decree of the circuit court will therefore be reversed and the cause will be remanded to that court for a new trial.         *Reversed and remanded.*