## McAtee v. McAtee et al.

June 23, 1944.

Silas Jacobs for appellant.

M. J. Hennessey and C. R. Barker for appellees.

Opinion of the Court by Judge Thomas—Reversing.

Ben G. McAtee, a citizen and resident of Bracken County, died testate in the early part of August, 1938, having executed his will on October 18, 1934, approximately four years prior to his death. He left surviving him his widow, two sons, some daughters and grandchildren of deceased daughters.

On August 8, 1938, the will was probated in the county court at an ex parte hearing. The appellees, some surviving heirs of testator, prosecuted an appeal to the Bracken circuit court from the order of probate entered in the county court, upon the alleged grounds of mental incapacity and undue influence, each of which was denied in the circuit court by contestees. At the trial held in that court there was a verdict against the will upon the ground that the testator was unduly influenced to make it, but the court properly declined to submit the issue of mental capacity to the jury, since there was no probative testimony to establish that fact and which ruling of the court meets our unqualified approval. From the verdict and judgment setting aside the will appellant has appealed to this court. Both sides agree that the only issue in the case is, whether or not appellant's motion—made in the circuit court—for a peremptory instruction directing a verdict sustaining the will should or should not have been sustained. A view of the background is pertinent in the determination of the only question involved.

The testator with his wife and children lived upon a farm in Bracken County containing 187 acres, but a portion of the tract containing about 75 acres, and upon which the residence was located, embraced the best farming land of the entire tract, the other part of it being more or less timber, as well as hilly, and containing only small portions suitable for agriculture. Testator and his wife had resided on the tract the greater portion of his life and had reared their family there, all of whom appear to have been industrious and contributed their labor in operating the farm; but all of the children except appellant had married and with their families moved away from the homeplace and settled in homes of their own. So far as the record discloses they were reasonably prosperous at the time the will was executed. Acie (appellant) was the youngest child. He remained on the farm with his parents but he married before the will was executed and he and his wife continued to occupy the homeplace with his parents, there being no children born of that marriage.

While the elder brother, Albert McAtee, remained on the farm, he and appellant received one-half of the produce of the farm and testator the other half, although he, himself, made a regular hand and exercised his right in supervising the management of farming operations. Albert McAtee moved off the farm some two years after the close of World War No. 1, after his return from military service as a soldier in that war. That left only two of the children at home, who were: Acie McAtee and an unmarried daughter, Dessie, but she sometime prior to the execution of the will married Claude Glenn whose first wife was her sister, who died leaving children. Glenn's second wife died some four months before the will was executed and without children. Her death was very much grieved by the testator, but the record discloses no other effect upon him. Some week or more before the will was written testator called on his old friend, J. A. Moneyhon, who was then and had been county court clerk of Bracken County since 1918, and informed that officer, and his friend, that he, testator, was thinking about making a will. Witness then testified:

"He came to my office and said he was thinking about making a will and asked me about writing it. I asked him what he wanted to do. He said he wasn't ready

that day; that he was just thinking about it but said that some of these days he would come in and have me write it for him. * * *"

Testator later returned with a memorandum of how he desired his will written and procured Moneyhon to write it as dictated by him to the scrivener, during which he would refer to his memorandum.

The sheriff's office was nearby and the ·clerk sent word to the sheriff—who was also well acquainted with the testator—to come into the clerk's office and witness the will, which he and the county court clerk did after testator, had signed it, and which the proof showed was all done at the request and in the presence of testator. They both testified that testator was a man of strong mind and above the average in intelligence, and they were confident that he knew exactly what he was doing, although at his age (about 75 years) he was somewhat feeble physically, but not mentally, he at the time suffering from prostate trouble. Each of them said that his son, the appellant, was not present when the will was written or when it was executed; nor did either of the witnesses see him at any place in the courthouse. However, Acie testified that he did go with his father to Brooksville on that occasion as he had. done on many another previous one. The will was left in the custody of Moneyhon, the county court clerk, whom testator directed to keep it, and it remained in his custody until it came time to probate it.

During the intervening period of nearly four years after the will was executed testator was frequently in the county clerk's office either on business or calling on his lifelong friend, but he never expressed any dissatisfaction with his will, nor gave out any intimation of displeasure with reference to the disposition of his property he had made in it. After the usual heading clauses concerning sound memory and the payment of debts, the pertinent part of the will is:

"Second: All the remainder of my estate, real, personal and mixed, wheresoever situated, invested or found, I give, devise and bequeath to my beloved wife, Rebecca McAtee, to have and to hold, use and enjoy so long as she shall live, except the household goods. These she may do as she desires.

"Third. At the death of my beloved wife, I give

to my son, Acie McAtee, all of my real estate situated, lying and being on the south side of Grover's Run (same being the 'Home place') containing approximately seventy-five acres of land. It is understood, however, that the said Acie McAtee is to remain with me and my wife so long as either or both of us shall live just the same as he is now doing and he is to have the right to cultivate as much land as he may desire, giving the one-half of crops as rental for the purpose of paying taxes, repairs, grass seed, etc. I also give my son, Acie, the right to remove the barn on my other land to the 75 acre tract, but he is to pay my other heirs the sum of Two Hundred Dollars for said barn.

"I further direct that my son, Acie McAtee, shall pay to Albert McAtee and Louvena Haley, (the other two surviving children) each, the sum of One Hundred ($100.00) Dollars and to Alma and Chester Glenn, each, the sum of Fifty ($50.00) Dollars. This not to be due and payable until the death of my wife and if it is not convenient for him to pay same at the time he is to have five years in which to pay same. The said Acie McAtee is to have all farming implements and other personalty after my wife's death. (Our parenthesis).

"Fourth. If I should have any interest in my personalty that belonged to my daughter, Dessie Glenn, at her death, I give same to Alma and Chester Glenn, absolutely.

"Fifth. I give all the remainder of my real estate (about 100 acres) to Albert McAtee, Louvena Haley and the two children of my deceased daughter as follows:—To Albert and Louvena, each the one-third and to Alma and Chester each, the one-sixth, and I direct that said real estate be sold just as soon as possible after the death of my wife and the proceeds divided as directed herein.''

He named as executor of his will the appellant, Acie McAtee, and gave him power to sell and convey the remaining portion of the farm above seventy-five acres and divide the proceeds as directed in the will. It will thus be seen that Acie was given by the will, in remainder, only the seventy-five acres of land upon which the homeplace was located, but expressly conditioned upon his performing the obligations stated in the will which are, (1) that he should continue to live on the farm "just

the same as he is now doing'' including his receiving only one-half of the crops. (2) Pay to testator's other two surviving children $100 each and to his two grandchildren, Alma and Chester Glenn, $50 each, but not to be due until the death of testator's wife. There also went to Acie whatever farming implements and other personalty belonging to testator that might remain after the death of his widow.

After testator's death his widow, with Acie and his wife, continued to occupy the home on the terms stated in the will in which all of the appellees—so far as this record discloses—acquiesced until the death of the widow a short time prior to the prosecution of the appeal to the circuit court from the county court order probating the will. Such acquiescence is strong presumptive evidence that no appeal to the circuit court would have been prosecuted had the widow continued to live, since during her life, and while Acie was shouldering the burden imposed upon him by the will, no dissatisfacton was expressed. No intimation is made in the record that Acie had failed, or will fail, to carry out the other directions of the will with reference to contestants, the testimony being silent with reference thereto. It is therefore seen that the bounty given Acie was considerably loaded with burdens imposed upon him by the testator, and which were conditions upon which the devise to him was made. If he induced his father to thus shackle the portion he received by the will it bespeaks, to say the least of it, a somewhat generous disposition on his part, since he was required to divide the fruits of his labor into halves receiving for himself only one of them and to continue to live upon and operate the farm on such terms throughout the life of his mother who might have lived, according to her then age long enough for him to have paid for the farm outright, to say nothing about the imposed payments by Acie to the other heirs.

Every witness in the case testified that testator was not loquacious, but more or less silent; that he possessed indomitable will; was firm in his conclusions and determinations. Illustrative testimony to that effect is given by the witnesses, Matt Workman and Vernon Wilson. The former stated: ''He was a man that took care of his own business, never talked much about his business to other people. He made up his own mind. Q.

Was he an intelligent man? A. Yes sir." The witness, Wilson, on being asked "Q. What kind of a man was he?" answered "Ben McAtee was a man of very sound judgment. He couldn't be dictated to in any way. He made up his mind what he wanted and he-stuck by that." As we have said, practically every witness testifying at the trial gave substantially the same testimony.

The only testimony that may be considered as remotely bearing (even if it can be so characterized) upon the issue of undue influence was given by Albert McAtee and one of the Glenn children who had married a man by the name of Fields, and who at the trial bore the name of Alma Glenn Fields, who stated that her grandfather, the testator, did not talk much but "He usually had something to say when he did talk." She said that she knew and remembered the day that the will was executed and seeing her grandfather with her Uncle Acie on their way to Brooksville; that on their return she asked her Uncle if her grandfather had made a will, to which she received an affirmative answer. She then testified: "I asked him what he did, and he said he gave him the homeplace and was taking care of me and Chester (her brother) at the other place." Later witness testified that Acie was at her house during a period of some sort of misunderstanding between him and his wife, when she had gone to the home of her father, which was later shown to be only temporary and on a visit; that while there witness stated that Acie told her (his wife) to come back, "it wouldn't be long until they would have a good home." She stated that her grandfather had not then made a will, although she had testified just previous thereto that it was on a later occasion following the time Acie and her grandfather returned from Brooksville where and when the will was executed.

Contestant, Albert McAtee, moved to Indiana from the parental home some two years following the close of the first World War where he has continued to reside with his family. His sister, Dessie, the second wife of Claude Glenn, died in September, 1934, and he attended her funeral though he did not spend the time of his visit at the home of his parents, but at the home of his brother-in-law, Claude Glenn, located about one mile from the old homeplace. On the day he expected to return to his home in Indiana he stated that he went early in the morning to the home of his parents where he "found Acie

out in the cow lot driving in the cows." He stated that his father came out and all of them were talking when Acie told testator that "if he lived he would have to make a will." Witness declared that he stated to his father that he (testator) did not have to make a will, to which his father replied that he was going to make a will if he lived. He then testified that Acie refused thereafter to transport him to the bus station for his return trip home, all of which testimony Acie denied. Later on the witness stated that he made another visit to his father's home about one year from that time, and he then asked his father if he had ever made a will, receiving the answer, as told by the witness, "He was getting old and didn't have long to live, and that he had been to Brooksville and made a will. He said he made it to suit Acie and Jake Moneyhon. He said he had to live in peace." However, that declaration by testator, even if made, is not substantive evidence and which, standing alone, "would not warrant the submission of the case to the jury, in the absence of substantive evidence on the issue." That principle of law has been approved by this court in many cases, the latest of which is Welch's Adm'r v. Clifton, 294 Ky. 514, 172 S. W. 2d 221, 148 A. L. R. 1220. There is then left only the statements of Alma Glenn Fields as to what occurred on the return trip of testator and her Uncle Acie from Brooksville on the day the will was executed, and the other statement by the same witness above set out, plus the alleged conversation in the cow lot at the home of testator on the occasion testified to by the witness, Albert McAtee.

In Caldwell's Judicial Dictionary, Vols. 3 and 6 of the two editions thereof under the heading of "Undue Influence," many cases are cited defining the words as applied to the execution of wills and contracts as:

" 'Any influence obtained over the mind of a grantor or testator to such an extent as to destroy his free agency, and to constrain him to do against his will what he would otherwise refuse to do. But any reasonable influence obtained by acts of kindness or by argument addressed to the understanding is not in law undue influence.' Chrisman v. Quick, 174 Ky. 845, 847, 193 S. W. 13."

All domestic cases, both before and since the rendition of the Chrisman case, approve that definition of un-

due influence requisite to destroy a will or a contract executed by the one so influenced. If Acie made the statement attributed to him by his brother, Albert, in the cow lot (which Acie denied, as we have seen) it, nevertheless, was a wise suggestion by him to his father, since the latter was growing old and becoming more feeble physically. Without a will his widow would receive of testator's real estate only one-third thereof in value for her life, instead of the whole of the most valuable part of the farm.

All other heirs, except Acie, had long since moved away and acquired homes of their own, and so far as this record shows they manifested but little concern, even after testator's death, for the welfare of his surviving widow. They were each possessed of property and were so situated as to take care of themselves. Acie, if he made the remark attributed to him, did not pretend, according to the testimony of his brother, Albert, to state any terms that the will should contain, nor intimated in the least that he contemplated any preference over and above the other heirs. His motive no doubt—if the testimony of Albert McAtee is true—was that his father should provide means whereby his mother should be secured a living and a guarantee of all necessary support throughout the remainder of her life, even if—as turned out to be true—he should be the one selected to execute such provisions for the protection of his mother. If he had so expressed himself directly to his father it would then not amount to undue influence sufficient to nullify the latter's will, since it would have amounted to no more than an ''argument addressed to the understanding'' of his father and would not be undue influence under the prevalent legal definition of the phrase.

The testimony of Alma Glenn Fields with reference to the same issue falls far short of even approaching undue influence. It merely revealed that testator had, while at Brooksville that day, executed a will, a part of the contents of which Acie imparted to his niece. He, however, denied all of that conversation, but admits that testator informed him that he had executed a will on that day. We are entirely unable to discover from such testimony any act or words of probative force on the part of appellant showing undue influence on his part in procuring his father to make the will as he phrased it,

after mature deliberation according to the testimony of the witness, Moneyhon. The will, according to our view of the circumstances and conditions surrounding testator, was a most equitable and just one, and such as a sane individual with a desire to provide for a surviving spouse during his or her lifetime would most probably make.

It should also be remembered that undue influence sufficient to set aside a transaction by a party to it or his privies, must be such as "to restrain him to do against his will what he would otherwise refuse to do." Therefore any influence falling short of having that effect would not authorize an annulment of the attacked transaction. As we have pointed out, supra, all of the witnesses testified that testator could not be influenced so as to destroy his free agency, or to induce him to perform an act against his will as he had matured it in his mind. Such testimony also overcomes any presumptions, inferences or conclusions that might be drawn from a confidential relationship existing between the parties to the transaction.

If, however, we should attribute to the testimony, supra, of Albert McAtee and his niece, Alma Glenn Fields, on the issue of undue influence, the effect of producing a scintilla of proof of undue influence in this case, it would still be our duty under the recent case of Nugent v. Nugent's Ex'r, 281 Ky. 263, 135 S. W. 2d 877, and cases following it, to direct a verdict against the scintilla of proof, and which we are confident was required in this case. The court in its instruction submitting the issue of undue influence correctly defined it, but it did not contain the qualification, most generally approved in such instructions, that "any reasonable influence obtained by acts of kindness or by argument addressed to the understanding is not in law undue influence." We have refused to reverse verdicts like the one under consideration for the failure of the court to insert such qualifications in the undue influence instruction. Nevertheless, we have held that it is the better practice for the instruction to contain the qualification pointing out to the jury what would not be undue influence. Therefore, on another trial, if there should be one on sufficient evidence the court will insert the qualification as a part of its undue influence instruction.

Wherefore, the judgment is reversed with directions to set it aside, and if another trial is had and the evidence is substantially the same as on this one, contestee's motion for a directed verdict sustaining the will should be sustained.