## Thomas v. Thomas' Administrator.

(Decided March 5, 1935.)

WORSHAM & KING for appellant.

VANCE & HEILBRONNER and PENTECOST & DORSEY for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

The first trial of the contest of the will of Harry

A. Thomas resulted in a verdict finding that it was not his will. Conceiving that the evidence had not authorized an instruction on undue influence, the contestee's motion for a new trial was sustained. The second trial submitted only the question of incompetency and resulted in a verdict sustaining the will. The contestant moved that the first verdict be substituted and the judgment rendered thereon instead of the last one. That motion was overruled, as was also the motion for a new trial, and judgment was entered accordingly. The contestant appeals from that judgment, but has brought up only the transcript of evidence heard on the first trial. The only point raised is that it was error not to substitute the first verdict. That rests upon whether the court erred in setting it aside, and that in turn depends upon whether the evidence authorized the submission of the question of undue influence. The appellees have moved to dismiss the appeal because not timely prosecuted. We have given full consideration to the motion and conclude that it should be overruled. Our conclusion on the merits of the case makes it unnecessary to state the reasons.

In the consideration of the only point involved on the appeal, we need look only to the evidence tending to sustain the appellant's contention that the instruction on undue influence was properly given on the first trial. However, that would seem to require a brief general statement of the life and character of the testator. He was 70 years old when he died, and had never married. Thomas was born in Chicago and came to Henderson about 1904, where he opened and continued to conduct a secondhand and junk store, and in a limited way a pawnbroker's shop. He had no clerk and lived alone in squalor in a room above or back of his store. He was regarded as eccentric, both in his mode of living and manner of conducting his business. He would go away for indefinite periods without letting it be known where he was going or when he would return. He had traveled a good deal and gone around the world four times, visiting in out of the way places. He related how on one occasion he had removed his wooden leg and begged on the streets of China and Japan, securing enough to pay his expenses. He was quite a reader and something of a philosopher. Like many men of that type, he had traits of shrewdness in trading and miserliness in possession. Thomas was a

drunkard. His sprees became more frequent and severe as time ran along, and he continued in the use of moonshine whisky. When on these sprees, he would close up his business. There was much evidence that his mentality had become seriously affected by strong drink. It was the cause of his death. Several hours after death had come upon him, his body in a pitiable state was found in the yard at his back door, where he had apparently fallen from his chair. It is fair to say that the evidence of the contestees minimized testator's drinking and emphasized his social nature and business acumen.

We may go back and review the course of the years. His parents and two brothers, George and Arthur, lived in Chicago. With his parents lived his niece, the daughter of Arthur, whose mother had died when she was less than 3 years old. She is the contestant and appellant, Jennie E. Thomas. When she was still quite young, her uncle lost a leg in a railroad wreck, and after he left the hospital, she dressed and attended the injury until it healed, for which services her uncle assured her she would not be the loser. Some years later he contracted yellow fever in the South and came home. In fear of quarantine, he would not call a doctor, and this niece nursed him through that illness. He appeared always to be appreciative of her kindness. During these years, Miss Jennie kept house and did all the work for her grandparents. As time went on, the testator would come home periodically and he would tell his mother that he was getting along fine and that he intended to take care of her and Miss Jennie, and for his mother not to worry over their future welfare. In the summer before the mother's death in 1909, Thomas told his mother that he had left everything he had to her in his will, and she stated: "So long as you look after Jennie, Harry, that is all I want. I won't be here." He responded: "Don't worry, I will take care of her." The day after the mother's funeral, he inquired of her father as to Jennie's full name, saying that he was going to put it in his will instead of his mother. However, on the trial of this case his brother George produced an original will, bearing date of April 27, 1909, and which Harry had given him shortly thereafter. This bequeathed all of his estate to his brother George. At this time the niece was about 27 years old.

Some time afterward her grandfather went to live with her Uncle George and died in 1911. Miss Jennie went to live with a friend and since then has kept house for her. She was about 50 years of age when her uncle died and has earned during her life but little more than her living expenses. She inherited $3,000 or $4,000 from time to time, most of which was lost in bad investments. In 1921, and again in 1928, Miss Jennie traveling with her companion stopped in Henderson to see her uncle and was treated cordially. It appears that the testator went to Chicago about twice a year, and while he usually saw his niece, he stayed with his brother George. George was a bricklayer by trade but kept a saloon for several years until 1918, and after that was in various employments. While the character of the evidence is not very strong, there was some showing that these brothers had the habit of getting drunk together nearly every time Harry went to Chicago. George visited Henderson a few times, and their conduct was likewise. They had carried on frequent correspondence during the years. The contestee's evidence established a common intimacy between brothers and was coupled with emphatic denials of any discussion of the disposition of the testator's estate or any attempt to influence him in any respect. The record produces the impression that George was a considerate and substantial man.

Thomas executed a will on December 5, 1917, in which he devised his estate to his brothers, George and Arthur, equally. Arthur was the father of the appellant. Following his death in 1923, Harry told his attorney about it and that he had left a daughter but she had nobody dependent upon her and could take care of herself, while his brother George had a family he was raising and educating, and stated that he would be in to see his attorney. He went to see him a few days later and the will in contest was written and executed. It gives a certain life insurance policy to a friend who was one time a joint owner with testator of some property in Henderson and to whom the policy had theretofore been assigned, and by whom the premiums had been paid. To his niece, Miss Jennie Thomas, the contestant, he bequeathed only $100. The balance of the estate was given to his brother George. Shortly after the will was executed, Harry gave George a copy of it.

A year or so before his death in 1930, Harry told an acquaintance in Henderson that his only relatives were his brother and niece and intimated that there was some disagreement with his brother, but said, ''My niece I will remember.'' His estate was appraised at $17,526.

By some men the will might be said to be unnatural and unjust because of the past services of the niece, the assurances given her grandmother, and the fact that she has but little property and is not equipped to make a living for herself in her older days. But the disposition cannot be regarded so grossly unnatural as to make it a witness against itself. The natural objects of the testator's bounty at the time the will was executed were both his brother and niece. While a part of the measure of competency of a testator is his ability to know and recognize his obligations to such, merely an unequal division among them has never been regarded of decisive importance or as raising a presumption of undue influence in the making of the will, although a grossly inconsistent, unnatural, and unjust disposition, coupled with other circumstances, may constitute sufficient evidence to take a case to the jury. Helm's Guardian v. Neathery, 226 Ky. 42, 10 S. W. (2d) 474; Mossbarger v. Mossbarger's Adm'x, 230 Ky. 230, 18 S. W. (2d) 997; Moran's Ex'r v. Moran, 248 Ky. 554, 59 S. W. (2d) 7. In regarding the susceptibility to influence, the degree of mental strength is an important consideration, and there was evidence tending to show some impairment of the testator's mind. But there was no evidence of any sort tending to prove the exercise of any influence on the part of the brother in the execution of the will. It is argued that his will was changed after a visit with George. The testator had returned from the funeral of his other brother, to whom he had devised one-half of his estate, and this was a natural change. It is but a mere suspicion that George had induced Harry to give his deceased brother's devise to him instead of to the former's daughter, or that he had misrepresented the financial condition of their niece. It must be remembered that neither of the previous wills made in 1909 and 1917 had devised anything to the niece. The reasons given the attorney who prepared the will under attack were reasonable and true to a great extent.

We are unable to discover any evidence which

authorized the giving of an instruction on undue influence. Hence we conclude that the trial court properly set aside the verdict because of his error in so instructing the jury. Shelley v. Chilton's Adm'r, 236 Ky. 221, 32 S. W. (2d) 974; Bennett v. Bennett's Ex'r, 244 Ky. 394, 51 S. W. (2d) 241; Whallen's Ex'rs v. Moore, 248 Ky. 348, 58 S. W. (2d) 601; Dossenbach v. Reidhar's Ex'x, 245 Ky. 449, 53 S. W. (2d) 731. It follows therefore that the judgment refusing to substitute the first verdict for the second is correct.

Judgment affirmed.