### Ross et al. v. Lott et al.

Jan. 16, 1945.

Woodward, Dawson & Hobson for appellants.

Ewing L. Hardy, and Hardy & Logan for appellees.

OPINION OF THE COURT BY JUDGE HARRIS—Affirming.

"We, the jury, find the paper dated August 25, 1942, purporting to be the codicil to the will of J. Martin Ross, is the codicil to his will."

On this appeal the appellants—whose evidence was directed solely at their one ground of contest, that of undue influence—argue with much vigor and no little fervor that that verdict is so flagrantly against the evidence, and so indicative of passion or prejudice, that it should be set aside. In support of their position, they summarize the evidence and rely upon the authority of Alcorn v. Alcorn, 279 Ky. 1, 129 S. W. 2d 520; Davidson v. Davidson, 180 Ky. 190, 202 S. W. 493; Gregg v. Hedges' Guardian, 227 Ky. 268, 12 S. W. 2d 854; Douglas' Executor v. Douglas, 235 Ky. 121, 29 S. W. 2d 637; and Hanna v. Eiche, 258 Ky. 282, 79 S. W. 2d 950.

According to the record, J. Martin Ross was a high class, Christian gentleman, and for many years he had been an employee of the Louisville & Nashville Railroad Company, by which, in recognition of his long and faithful service, he had been pensioned a few months prior to his death. His exact age is not shown by the record, but it is evident that he was elderly. He had no children; and his good wife, who had been an invalid for some years, and to whom he appears to have been touchingly devoted, died on January 25, 1941, at the age of 80. In his bereavement and loneliness, he appealed to different people to move into his home and care for him, but his efforts in this respect were unsuccessful until he finally perfected with the appellee and her husband the arrangement which will be noted hereinbelow.

On September 4, 1941, under the circumstances recited, Mr. Ross executed his original will:

"I, J. Martin Ross, being sound in body and mind, declare this to be my last will and testament.

"First, I desire that all my debts, if any, to be paid.

"Second: I desire that my body be buried by the side of my deceased wife, Molly F. Ross, on my lot in Resthaven Cemetery, near Louisville, Ky.

"Third: I give my diamond ring to my wife's great niece, Mrs. Burton Phillips Tyrrell, of 1275 Willow St., Louisville, Ky.

"Fourth: I give my Howard watch to my nephew, Clarence Ross, of No. 616 Harriett St., Evansville, Ind.

"Fifth: After all expenses of my funeral have been paid, I desire that the remainder of my estate be divided into nine (9) equal parts, and that

"Two (2) shares be equally divided between the two heirs of my deceased brother Claude C. Ross, 616 Harriett St., Evansville, Ind.

"Two shares to be equally divided among the heirs of my deceased sister, Mrs. R. D. Julian, Spurgeon, Ind.

"One share to go to my half sister Mrs. Walter Ritchey, 1271 So. 30th St., Indianapolis, Ind.

"One share to be divided equally between my two other half sisters, Mrs. Bernice Grand, Akron, O. and Mrs. Hazel Hicks, Amarillo, Tex.

"One share to the heirs of my deceased brother Will Ross, California.

"And the remaining two shares to my *wifes* niece Mrs. Lelia B. Phillips, 1275 Willow Ave., Louisville, Ky.

"I desire that my nephew L. G. Julian, 1660 So. East Blvd., Evansville, Ind. act as executor without bond and that he be suitably compensated for such service.

"Signed by my own hand this 4th day of Sept. 1941."

In December of 1940, Mrs. Lott purchased, and shortly thereafter moved into, residential property adjoining that of Mr. Ross. On May 7, 1942, Mr. Ross and Mr. and Mrs. Lott entered into a written agreement whereby Mr. and Mrs. Lott should move in with Mr. Ross

and board him for a period of one year. This arrangement, as attested by subsequent developments, proved to be mutually satisfactory, and continued until Mr. Ross' death. On August 25, 1942, Mr. Ross executed the codicil which is referred to in the jury's verdict:

"Louisville, Ky. Aug. 25—1942

"Codicil to Last Will and Testament
of J. Martin Ross.

"I hereby devise and will my house and lot at 1315 Mossrose Ave., Louisville, Ky. with all its contents to Mrs. Grace Lott, provided that she is keeping house for me at the time of my death. This in recognition of the care and attention she has given me.

"Written and signed by my own hand.
"(Signed) J. Martin Ross
"Witness: (signed). E. L. Minton
"Robert F. Woerner"

On September 3, 1943, Mr. Ross accompanied Mrs. Lott on a trip to Pueblo, Colorado, to see the latter's sister, who was ill. On the 8th of that month he was taken violently ill, and died in a hospital there on the following day. Mrs. Lott promptly returned with his body to Louisville, where it was buried.

With only two exceptions, the testimony on behalf of the appellants with respect to undue influence is confined to that given by the appellants themselves and by members of their immediate families. Substantially, it is as follows:

Prior to the appearance of Mrs. Lott, Mr. Ross had been devoted to all his kinfolks—most of whom lived in Southern Indiana—and visited them once or twice a year. From the time Mrs. Lott moved into his home, he did not associate with his old friends and his relatives as had been his custom. On August 3, 1942, which was only three weeks before the date of the codicil, he wrote his sister in Akron, Ohio, that the people living in his house were going to buy it. A short time before he left for Colorado he made his people in Indiana a short visit, but said nothing to them with respect to his contemplated trip. On one of his visits to Indiana, Mrs. Lott talked with him over long distance phone, following which he seemed disturbed, and returned to Louisville. Mrs. Phillips had known Mr. Ross for almost 40 years. During

Mrs. Ross' illness, Mrs. Phillips would visit the Ross home once or twice a week. After Mrs. Ross' death, Mr. Ross visited Mrs. Phillips frequently until the advent of Mrs. Lott, after which Mr. Ross ceased visiting Mrs. Phillips and told her not to come to his place until he called for her, which he never did. When Mrs. Lott returned from Colorado with the body, she was rather rude to the relatives and gave them to understand that they were not welcome; did not co-operate with the executor named in the will, and displayed a secretiveness which appellants construed as indicating sinister designs and motives on her part.

In addition to their testimony, which is as set out above, it is insinuated by appellants—indeed, strenuously argued in their brief—that Mrs. Lott wheedled money from Mr. Ross and also prevailed upon him to pay the expenses of her trip to Colorado. These insinuations are just that, so far as the evidence is concerned. It is also insinuated that Mr. Ross' death was rather mysterious, and that Mrs. Lott had a guilty connection with it. This is likewise without foundation and completely refuted by the death certificate, and by the autopsy, each of which shows that he died of mesenteric thrombosis.

The testimony of Mrs. Lott and of her witnesses is to the following effect:

She and her husband moved into the property adjoining the Ross property in February of 1941. From that date until they moved into his home he was a frequent visitor, took many meals with them, and on many occasions endeavored to persuade them to move into his home, which they finally did. In August of 1942, Mr. and Mrs. Lott made plans to visit the latter's sister in Colorado. Learning of the intended trip, Mr. Ross requested that he be permitted to accompany them, to which they acceded. After plans for the journey had been completed, the superintendent of the plant where Mr. Lott was engaged in war work would not grant the latter a leave of absence. It was then arranged, with the full approval of Mr. Lott, that Mr. Ross and Mrs. Lott, should make the trip—Mr. Ross to pay his expenses and Mrs. Lott to pay hers. When Mr. Ross wrote the codicil, he showed it to Mrs. Lott and told her it was a present.

To complete our resume of the testimony and of the circumstances antedating and attending the execu-

tion of the codicil, we quote from the testimony of the subscribing witnesses.

Robert Woerner:

"Q. Where are you employed? A. In the Auditor of Freight Accounts, L. &. N. Railroad Company.

"Q. How long have you been employed there? A. About twenty-three years.

"Q. How long did you know J. Martin Ross? A. Well, more than twenty years.

"Q. I will show you a writing dated August 25th, 1942, codicil to the will of Mr. Ross, and ask you if that is your signature as a witness? A. It is.

"Q. You signed it on August 25th, 1942? A. About that time. I have nothing to fix the date in my mind. It was the latter part of August.

"Q. Did Mr. Ross say anything to you about writing a codicil to his will before that paper was produced to you on August 25th? A. He did not mention the matter of a codicil. He came in the office something like two weeks prior to that time and asked me if it was possible for a person to make a will leaving their property to a person other than a relative, and I told him it was.

"Q. Did he ask you anything else, or tell you anything else at the time? A. I asked him whether he had any close relatives, and he said the closest relatives he had were nieces and nephews, or both, I don't recall. He said he was not particularly close to them, and that he had in mind making his will, or changing his will, to leave his home to his housekeeper.

"Q. State the circumstances of the signing of it, will you, please, and who was there at the time that it was signed? A. Well, he came in the office and came up to me and said, 'Well, Bob, I have that fixed, I want you to witness it.' I did not recall offhand exactly what he was talking about real quick. I said 'What, Mr. Ross,' and he said 'the codicil to my will.' I said who is the other witness. He looked around and saw Jack Minton nearby. He called to Jack and asked him to come over and Jack came over. He said I want you to be one of the witnesses to my will. Jack said, all right; so he unfolded the paper and signed it and Jack signed it I believe and then I signed it.''

156

Ernest Minton:

"Q. Will you state your name to the Court, please? A. Ernest Lee Minton.

"Q. Where are you employed, Mr. Minton? A. The L. & N. Railroad Company.

"Q. I wish you would tell to the Court and to the jury the circumstances under which you signed that as a witness? A. Well, I was on the third floor of the main office building, that is, the division of our office. Mr. Ross called to me, and I went over to see what he wanted. He was on his pension at that time. He asked me if I would sign his will. Well, I told him I did not know as I had any objection to signing it, so Robert Woerner, whom he called earlier and Mr. Ross and myself walked over to one of the metal cases that contain our records, and I signed the document after hurriedly glancing over it, and Mr. Woerner signed it, and Mr. Ross signed it. We all three signed it in each others presence.

"Q. Did he, at that time tell you this was a codicil to his will? A. If my memory serves me right, he called it his will.

"Q. Was anybody with him at that time other than you two witnesses? A. That is all.

"Q. Was the defendant, Mrs. Lott with him at that time? A. How was that?

"Q. Was Mrs. Lott with him at that time? A. I told you no one was with him."

The appellants' cited cases are not in point. In each of those cases the weight of the evidence was that the maker of the deed or of the will was mentally incompetent and, in addition, the evidence was direct and unrefuted that the execution of the instrument was arranged for by some one acting in his interest. In the present case there is not even a claim of mental incapacity and the evidence is direct and unrefuted that Mrs. Lott did not arrange for and was not present at the execution of the writing under attack. In short, the facts bring the present case within the long and well established rules and principles of this court, as reaffirmed in the recent case of Allen et al. v. Henderson et al., 299 Ky. 92, 184 S. W. 2d 885, wherein we said:

"It is true that undue influence may be proved by circumstances, and it has been said that where a will is

unnatural in its provisions and inconsistent with the obligations of the testator to the different members of his family the burden rests upon the propounders to give some reasonable explanation of its unnatural character. Woodruff's Ex'r v. Woodruff, 233 Ky. 744, 26 S. W. 2d 751; Helm's Guardian v. Neathery, 226 Ky. 42, 10 S. W. 2d 474; Walls v. Walls, 99 S. W. 969, 30 Ky. Law Rep. 948. These cases do not hold that the absence of a reasonable explanation of the seeming unnatural provisions of a will entitle the contestants to a peremptory instruction as argued by appellants. They merely hold, as pointed out in Higgs' Ex'x v. Higgs' Ex'x, 286 Ky. 236, 150 S. W. 2d 681, 683, that 'where there is gross inequality in the disposition of the estate among the natural objects of testator's bounty, or where the will is unnatural, such facts, when unexplained and when corroborated by even slight evidence of want of testamentary capacity, or of undue influence, are sufficient to take the case to the jury.' Cf. Keifer's Ex'r & Ex'x v. Deibel, 292 Ky. 318, 166 S. W. 2d 430.''

We are of the opinion that the jury's verdict was neither against the evidence nor indicative of passion or prejudice.

Judgment affirmed.