# Gay v. Gay et al.

November 19, 1948.

540

J. L. Llewellyn for appellant.

C. P. Moore and Lewis & Weaver for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

The contestant of the will of the late T. G. Gay appeals from a judgment on a directed verdict. The will devised testator's estate to his nephew, Bud Gay, and wife, Tommie Gay, excepting only $25 to his child, a little girl, named Veron June Gay. Undue influence on the part of the beneficiary operating upon a weak and infirm old man is the ground of contest. He was about eighty-four and his child eleven years of age.

When Gay was about sixty-six years old, he married a widow forty years younger. The child was born about five years later. Naturally he was devoted to her.. She testified, "He always treated me good-right except at the last." Bud Gay had lived with his uncle from the time he was thirteen years old until he married five years later. His uncle had great confidence in him. Testator's widow, Lydia Gay, testified that in recent years as her husband grew older he "raised a racket" with her whenever he returned from seeing Bud. When the child was two or three years old, Gay filed a suit for divorce. The grounds are not disclosed, but it appears that Bud was active in the matter. The parties were reconciled, and the widow offered to testify that her husband afterward told her that Bud and his wife tried to get him to deny the paternity of their child but he would not. We think this evidence was competent, for she was

not testifying for herself, and the fact that she was the guardian of the contestant did not disqualify her. Doty's Adm'rs v. Doty's Guardian, 118 Ky. 204, 80 S. W. 803, 26 Ky. Law Rep. 63, 2 L. R. A., N. S., 713, 4 Ann. Cas. 1064.

The old gentleman was very forgetful and given to crying. In short, senility had overtaken him. He had loaned Bud some money with which to make a race for sheriff and said he was afraid to ask him to pay it back as he was a dangerous man. About the middle of July, 1944, when Mrs. Gay returned from shopping for school clothing for the little girl and told him she had spent $8, her husband upbraided her for spending so much and quarrelled with her all evening. The next morning he renewed the quarrel, choked her, and struck her with a chair. He left home with Bud and his wife. Mrs. Gay then brought a suit for alimony. A settlement was reached in which he conveyed ninety acres to his wife on July 22, and agreed to divide his personal property equally with her. Each agreed to contribute to the child's support. As we understand, this was accepted as her entire interest in the estate. Gay then went to stay with his nephew, who was living in McKee. He returned to his home in Viney Bottom in two or three days and stayed a week. He and his wife finally agreed to live together again. Several witnesses testify to statements that he had decided to stay at home and keep their stuff together as he wanted his child to have it all when he died.

On Sunday morning, July 30, Bud Gay, his wife and son, Vee Gay, and his wife, and another person came in a truck. About the same time Bud's sister and her husband arrived. Bud and some of the others took the old man back of the house and engaged him in subdued conversation. He was crying. He came back to the front of the house and asked Moore to help them catch some hogs. One was then taken away and the others later in the division of the personal property. At his request, Mrs. Gay prepared dinner for the crowd, but when it was ready, they declined to stay to eat. She insisted on his staying and told him he did not have to leave home. He replied that he did. She asked, ''Why are you going?'' He answered, ''Because Bud wanted him to; and began crying.'' His wife helped him to change his cloth-

ing, as she always had done, and he left "choked up" and in tears.

The next day, Monday, the old gentleman appeared at the office of Bud's lawyer with Bud. The lawyer prepared a deed conveying all of the land that Gay owned to Bud and his wife in consideration of their taking care of him. The will was executed at the same time. It was witnessed by Bud's brother-in-law and nephew.

Two or three weeks later the little girl was taken to see her father. The court refused to permit her to testify that he gave her $20 and told her not to let Bud Gay or his folks know anything about it; also that he had told her he wanted her to have what property he had. These statements and others of like effect appear as avowals. They should have been admitted, for the rule which excludes a witness from testifying for himself as to a transaction with a deceased person does not apply in the contest of that person's will where the issue is mental incapacity or undue influence. Russell v. Tyler, 224 Ky. 511, 6 S. W. 2d 707; Hale v. Hale, 242 Ky. 810, 47 S. W. 2d 706. On another occasion the child's aunt took her to see her father. He went in the house and returned to the yard with two peaches concealed in the bib of his overalls and slipped them to the child, telling her that he would give her a lot of things, but for her not to tell anybody. At the courthouse, about two weeks after he had gone to Bud Gay's house, he told Marion Moore he wanted to go home to die but couldn't. He was crying at the time.

Mrs. Gay visited her husband twice after he left home. The first time was in Bud's house, but she had no opportunity to talk with him alone. The next time she saw him at the home of Bud's son, Vee Gay, where he had gone, as he told her, because Bud would not let her come to see him. He then told her that Bud had got mad and threatened to strike him, and that he wanted to die at home. She went back for him and sent him word to come over to Vee's house. She saw Bud's wife push him back in the doorway and he did not come. Bud had told Mrs. Gay not to come to his home.

After the will and deed were executed, a suit was filed by Gay for divorce. Bud was active in the taking of depositions. The suit was pending when Gay died

three months after the will was signed. And Bud Gay was killed two days before the old gentleman died. The testator's wife and child were not notified of his death and did not attend his funeral.

Neither opportunity to exercise undue influence nor the existence of confidential relations between a testator and a beneficiary, nor both, are enough in and of themselves to justify the judicial conclusion that the instrument is not a freely executed will. Nor is merely an unjust or unnatural disposition of an estate, or even the exclusion of a child who is normally the object of the testator's bounty, sufficient to justify that conclusion. See Jackson's Ex'r v. Semones, 266 Ky. 352, 98 S. W. 2d 505. But these conditions have a cumulative effect. Where the beneficiary exercised control of the testator and was actively concerned with the preparation of the will of one whose mental faculties are so impaired as to render him susceptible to selfish or improper influence, and the will is grossly unreasonable and plainly inconsistent with the testator's natural and moral duty to his family and is opposed to his expressed purpose, the circumstances are indeed persuasive. All of these factors are present in this case. There is a presumption of fact, though not conclusive, that the instrument was not executed by a free and unhampered will and a fixed purpose. Harrel v. Harrel, 62 Ky. 203, 204; Walls v. Walls, 99 S. W. 969, 30 Ky. Law Rep. 948; Helm's Guardian v. Neathery, 226 Ky. 42, 10 S. W. 2d 474; Hagedorn v. Scott, 228 Ky. 582, 15 S. W. 2d 479; Mullins v. Mullins, 229 Ky. 103, 16 S. W. 2d 788; Moran's Ex'r v. Moran, 248 Ky. 554, 59 S. W. 2d 7; Franks' Ex'r v. Bates, 278 Ky. 337, 128 S. W. 2d 739; Higgs' Ex'x v. Higgs' Ex'x, 286 Ky. 236, 150 S. W. 2d 681.

This statement as to the rise of a presumption or inference of fact is but to say that it transfers the burden of persuasion to the proponents of the will. The unfolding of the story reaches a stage where reason suggests that conditions were not what they would have been normally. To avoid confusion, it may be interpolated that this presumption is not a presumption of law and does not relieve the contestants of continuing to carry the burden of proof. Kiefer's Ex'r v. Deibel, 292 Ky. 318, 166 S. W. 2d 430.

The picture portrayed in this record is of a man upon whom the infirmities of age have come, his young wife, and child of his old age. Lurking in the background is a nephew in whom he placed great confidence. If the wife was a "thorn in the flesh" (principally a supposition), so much the more was the old gentleman susceptible to the influence of his nephew. It portrays the nephew persuading the testator to leave his home, his wife, and little girl on a Sunday afternoon against his wishes. The very next day he is in the office of a lawyer executing the will disposing of his estate contrary to his express purpose to leave it all to his child—to whom it should go by all natural ideas of right and justness. Here is an only child, still within the age of innocence, stripped of her entire patrimony and left with empty hands. Her father's estate is passed to him who had control and influence, if not domination, of him. An appreciation of the obligation to those whom nature makes the object of one's bounty is a component of the test for determining not only mental capacity but freedom of will. Here is a heartless disregard of a father's duty. This picture certainly affords the logical conclusion that the will was not a mere coincidence but is in fact the consequence. It is often said that a will is the best evidence for or against itself. A will making a just distribution of an estate will be held per se strong evidence of testamentary capacity, while one turning the testator's property into an unnatural channel gives at least some presumption to the contrary. This will makes a disposition of an estate which normal circumstances and the course of natural affections do not dictate. The document inherently bears cogent testimony of that influence which is denominated in the law of wills as undue. It reveals the operation of a power dominating the natural, the rational, the free will and mind of the testator to the extent that it led him to do that which he would not have done if left to the free exercise of his own judgment. Talbott v. Giltner, 179 Ky. 571, 200 S. W. 913.

As was said in Harrel v. Harrel, supra, 62 Ky. 203, 204:

"For such gross inequality no reason is suggested in the document itself or by the proof on the trial. The testator had an unquestionable power to make such a will. But its apparent unreasonableness requires satis-

factory evidence that it was the free and deliberate off-spring of a rational, self-poised, and clearly disposing mind. And all this has not, in our opinion, been shown by the testimony with sufficient assurance.''

It is rare that we find two cases so much alike as the present one and Walls v. Walls, supra, 99 S. W. 969, 30 Ky. Law Rep. 948. In that case a man fifty-nine years old had married a twenty-six year old woman. He had had trouble with his wife, was a sick man, and left substantially all of his estate to his children by a former marriage, principally to a son with whom he was closely associated. He practically excluded a two-year-old daughter. We spoke of the furtive character of undue influence and of the necessity of often accepting circumstantial evidence of its exertion. It was found to have been brought to bear and to have produced the will. The judgment setting it aside was held to have been supported by such evidence.

We have had no difficulty in reaching the conclusion that the evidence in the case at bar authorized a submission of the issue to the jury and that it was error to direct a verdict to find the instrument to be the last will and testimony of the deceased, and we have held in another opinion 308 Ky. 545, 215 S. W. 2d 96, that the deed executed at the same time should be set aside.

The judgment is reversed.