# Palmer et al. v. Richardson.

October 14, 1949.

George C. Robbins, L. Marion Oliver and O. P. Jackson for appellants.

Shumate & Shumate and George T. Ross for appellee.

STANLEY, COMMISSIONER—Reversing.

A verdict was returned that the will of A. J. Palmer was executed through undue influence, the only ground submitted to the jury in the contest. It is argued by the appellants that the trial court should have peremptorily directed a verdict that the instrument is Palmer's will.

Palmer owned a farm of 279 acres in Madison County, worth from $15,000 to $20,000 but subject to a mortgage of $2,500, and personal property of the value of $3,400. He bequeathed to his widow all his personalty, after payment of debts, and devised his land to her for life or remarriage, with the remainder to his four children and the children of a deceased son. To his daughter, Mrs. Fairie Lee Richardson, he gave ''the sum of one dollar as her full share of my estate and the reason that I am not giving her more is because I have already paid her share to her during my lifetime.'' Mrs. Richardson contested the will, claiming that the will was the result of the undue influence of her mother, Mrs. Fannie Palmer, and her brother, Scoville Palmer.

The testator had suffered with heart disease for three or four years before he executed his will on May 1, 1945. He died January 18, 1947. During this period of illness he had rested a good deal in bed. He had been married for thirty-seven years. Before he became ill, he had led a vigorous, active life. His family relations appear to have been pleasant and continued so with all his children until January, 1945 when a disagreement arose between him and his daughter, Mrs. Richardson, respecting a settlement of farm accounts. There is no contradiction in the evidence that the testator was a man of good sense and judgment and was not easily influenced. Dr. John W. Scott of Lexington, his physi-

cian, became well acquainted with him in his latter days. He testified he was "impressed that he was an unusually intelligent, fairminded man without any evidence of any kind of mental impairment." Dr. Scott was surprised that he had disinherited one of his children. We approach the consideration of the evidence upon which the contestant has relied bearing in mind the type of man the testator was shown to be.

Mrs. Richardson and her family had lived in Ohio until the early summer of 1944. She and her husband testified they moved to the home farm upon the insistence of her father through letters written by her mother. Her father had also written her to the effect that he wanted her and her husband to return and take charge of the farm because of his illness. But the mother testified that it was the other way around; that her daughter and husband, while on a visit, had suggested they could return if they were wanted. She and Mr. Palmer had talked it over, and he decided that if they wanted to come and would be better satisfied, they could do so, and she had so written her daughter. No letter was filed in evidence. Upon their return they made a contract of tenancy with Palmer and agreed with his son, Scoville, who left about June, 1944, to work elsewhere, as to his share in the crops he had put in. The Richardsons did not move into a house on the farm they were supposed to occupy but stayed in the home. This seems to have caused some irritation in the beginning. When Scoville moved, they went to live in a tenant house he had been occupying. The contestant proved that she and her husband had worked hard during the rest of the year. About this there is no dispute. She and her husband testified there was no trouble between them and her father until Scoville returned the first of 1945. About a week afterwards she learned that her father was dissatisfied. Her mother presented her with some papers, prepared by her father, agreeing to turn back the farm without any compensation and that Scoville should be the overseer. They declined to sign the papers. Her father sent for her to come to his room and told her that Scoville had reported they were not feeding the cattle and sheep like he had told them to do. Her mother suggested that he buy them out. He gave them a check for $800 on January 17, 1945, which states thereon that it was their share of the crops and stock.

In addition, they received credit for $223 which they admitted owing him. There had been no difficulty over the proceeds of the tobacco. The last words her father had said to her in this connection were that "I would share just like the other children." When her mother handed her the check she said they would have to get off the place in ten days.

A witness who had rented some of the land from Richardson stated he had seen no trouble until Scoville came back. However, on cross-examination he testified that Palmer and Richardson had had some trouble before this on account of the way Richardson was taking care of the stock, some of which had died. The witness admitted he had told Palmer that Richardson was not taking care of the sheep. He had heard Scoville say "that Greek is the cause of your leaving," referring to his sister, Mrs. Richardson. There is no explanation of the term. He had also said that the Richardsons could not stay there and that he would see "she didn't get none of the place at all." The witness was not unbiased since, as he says, "I got all messed up and had to leave" because of Scoville's return.

After they had moved away, Mrs. Richardson sent her children home for some potatoes she had left on the place, but they did not get them, and she went herself to see about them. Her mother "told papa to let me have them." He never said anything but went back to his bedroom. Her mother said that would be "the last thing I would get." Sometime in March, 1945, she took her niece and nephew to the home and asked to see her father, but her mother said he was sick and "it would not do for me to go in to see him." She saw her father sitting in a car in Richmond in July or August, 1945, which was two or three months after the will was executed. He didn't talk much but hugged and kissed her. From that time until his death, Mrs. Richardson visited her father, and all were friendly. Her husband went back but never saw her father. Finally he quit going as he felt he was not wanted. She and her mother had always been friendly. There was never any breach between them. The statement in the will that she had received her share of the estate is not true. She further testified that her father and mother and she were all "hurt about all that came up when Scoville came back."

This is all the evidence tending to show that the will was executed through undue influence. The will is natural and fair in all respects except the exclusion of the daughter. Whatever presumption that exclusion affords and whatever suspicion may be raised by the circumstances of the brother's appearance on the scene and his statement that his sister could not stay on the farm and that he would see she did not get anything from the place, the stubborn fact remains that there was a bitter controversy between herself and her father personally over the situation. All the inferences and presumptions favorable to the contest were dissipated by the explanations and the uncontradicted evidence in support of the will. First, there is the evidence that the testator was the master of his own household and was not easily influenced. According to the testimony of the mother, before the end of the year came her husband had learned that his son-in-law had been deceiving him. Particularizing, she said he had reported that it had cost $8 to shoe two mules but upon investigation, Palmer found out it was only $4. He had deceived him also about the price of some corn he had bought as well as about the condition of the crops. There is evidence of other acts which led the testator to regard his son-in-law as untruthful and not dependable. To the end of his life Palmer felt he had been mistreated.

In the settlement of the accounts Palmer insisted he did not owe the Richardsons anything while Mrs. Richardson insisted he owed them $1,500 for their interest in the crops and stock. She had threatened to go to court with the dispute. We are impressed with the fact that the mother acted as mediator, and throughout tried to ameliorate the unpleasant situation. When the daughter and son-in-law finally agreed to accept $1,000 (evidenced by the check and credit) according to Mrs. Palmer, her husband was unyielding. He finally stated that he was in debt but if Fairie Lee contended for it, he was going to pay her rather than have a lawsuit. When **he gave her** the check he said, "Now, Fairie Lee, you want your money," and further, "I could settle with you after awhile easier than now when I do with the other children; that is your part." This, however, is denied by Mrs. Richardson. Palmer had kept a diary for several years. On January 17, 1945, the day he

gave the Richardsons the check, he had entered in it, "Fairie Lee and Alford Richardson robbed me of $800."

Mrs. Richardson was much hurt because her mother did not come to be with her in childbirth. Mrs. Palmer testified, "I went in and said, 'Andy, Fairie Lee is sick and seems like I am going to have to go to her.' And he said, 'if you go don't come back to me.' I said, 'I am in between, I will have to stay with you.' He said, 'they have done me so bad and robbed me of my money.' He said, 'I would rather we had got along rather than getting in the woods, but she didn't.'" Further, on another occasion, "She came back one day and brought a big stick of candy. She asked me, said 'reckon papa would take this candy?' She came in, he was lying on the bed, she kissed him, and said, 'Papa, here is a stick of candy for you.' He said, 'I won't take it.' We both cried. I said, 'Andy, why don't you take it.' He said, 'I don't want it, I won't have it.'"

The testator had talked with his son, A. J. Palmer, Jr., and others about the controversy with the Richardsons and how he had been forced to pay something he did not owe. He sometimes cried when he discussed with his daughter, Rosella, how mean they had been to him. He told her what he had given Fairie Lee was more than the rest of the children would get of his estate. He had told his two brothers, who lived in different counties, that his daughter had not treated him right, had threatened to sue him and made him pay money that was not just; that he had offered to let the Richardsons choose two men and he would choose a third to settle their disagreement, but they would not agree. He told them he had made his will partly because of the way Fairie Lee had treated him; that he had told her he was not able to pay the money and asked her to wait until his death.

The only evidence relating to the execution of the will is that of the widow. Palmer went to Richmond and had it prepared by a lawyer. She had gone with him to the office but was not present in the room. He had told her he was going to make his will but did not tell her what he would put in it except that he was going to will Fairie Lee one dollar and no more for the way "she had stood up in his face and argued and went on and did not do like she ought to have done." She admitted she had

never liked her son-in-law and related much more than is above recited concerning her husband's dislike for him because of the farming transactions and the way he had been treated. Concerning the matter of influence, she testified that she had never heard Scoville or any of the other children tell their father how to make his will, and that he would not have paid any attention to any of them if they had. She added, "No one in the world could have turned him against Fairie Lee but herself. Nobody could have turned him against me but myself; but when you had done plenty to him you would just know that was final."

Upon cross-examination, the mother indicated she would have liked for her daughter to have shared equally in the estate. Being further pressed as to why she did not divide up her part, she explained that this was her husband's will and she thought it ought to be carried out like he wanted it.

The conclusion is inevitable that the testator, whether justified or not, very strongly felt that he had been mistreated by his daughter and son-in-law and that he had in fact advanced to his daughter her fair share of his estate. He may have been wrong. It would seem the jury believed that he was and undertook to right the wrong and give the daughter her part of the estate. But the law does not avoid a will because it is not in accord with what persons other than the testator deem to be a just disposition of the property. The courts do not have the power to make a testamentary distribution of property as it ought to be made. We have often written that though the disposition might appear unreasonable and unfair—even the disinheritance of a child—that per se does not conclusively afford or sufficiently prove that it was made through undue influence. It is only when the will is grossly unreasonable in its provisions and extremely inconsistent with the testator's duty to his family that, in case of doubt, the inequality can have any material effect on the question of undue influence. A departure from what is natural or reasonable when accompanied by other circumstances, such as a weak or unstable mind, or statements of probative value by the testator, or by incriminatory statements or acts by others who had cause, or might have had cause, to exclude one or more of the natural objects of the testator's

bounty or have obtained a benefit for himself or another, may constitute sufficient evidence of undue influence. Helm's Guardian v. Neathery, 226 Ky. 42, 10 S. W. 2d 474; Thomas v. Thomas' Administrator, 258 Ky. 236, 79 S. W. 2d 982; Hale v. Hale, 287 Ky. 271, 152 S. W. 2d 984; Ross v. Lott, 299 Ky. 150, 184 S. W. 2d 977; Phillips v. Johnson, 303 Ky. 574, 198 S. W. 2d 305; Gay v. Gay, 308 Ky. 539, 215 S. W. 2d 92. The record of the present case is not of that character.

Likewise, it is well settled that the mere existence of confidential relations between the testator and a beneficiary does not raise a presumption that he exercised undue influence over the testator and thereupon place upon him the burden of disproving it. There must have been proof of its exercise—evidence of activity or overt acts or incriminating statements of the person concerned or of conditions or statements of the testator himself which tend to show that he had been wrongfully influenced or imposed upon to do what he would otherwise not have done in the exercise of free will. Hildreth v. Hildreth, 153 Ky. 597, 156 S. W. 144; Jackson's Executor v. Semones, 266 Ky. 352, 98 S. W. 2d 505; Allen v. Henderson, 299 Ky. 92, 184 S. W. 2d 885; Teegarden v. Webster, 304 Ky. 18, 199 S. W. 2d 728; Faulkes v. Brummett's Administrator, 305 Ky. 434, 204 S. W. 2d 493.

In the present case, the only circumstances tending to sustain the position that the instrument is not in fact the will and the free disposition of the testator's estate is the evidence of the brother's return to the home and the early breach in the friendly relations with the daughter, plus a questionable statement of the brother's intention to see that his sister obtained no share in the property. This was five months before the will was executed, and all the proof is to the effect that during that time the testator himself continued to be offended at his daughter. It is doubtful if this constitutes more than a scintilla, which is not sufficient proof. If it be so regarded, it is wiped out by the positive, uncontradicted proof of the testator's attitude and the frequent statements of his purpose. The exclusion of the daughter under these circumstances was but the operation of a resentment over real or fancied wrongs perpetrated by his daughter. One has the right to dispose of his property as he pleases even though the distribution is contrary to the

198

dictates of natural or moral obligations. Helm's Guardian v. Neathery, supra; Burdon v. Burdon's Administratrix, 225 Ky. 480, 9 S. W. 2d 220; Jackson's Executor v. Semones, supra; Combs v. Combs, 271 Ky. 543, 112 S. W. 2d 989.

Duval v. Duval, 249 Ky. 186, 60 S. W. 2d 351, the principal case relied upon by the appellees is within the rules above outlined. But it is clearly distinguishable on the facts. A second wife was hostile to her stepchildren, caused them to leave the home of their father, consistently contrived to prevent them from visiting or even corresponding with him and caused their father to mistreat them and practically disinherit them. She had dominated and controlled her husband in all his personal and business transactions. He was 83 years old, a heavy drinker and completely subservient to his wife. She had boasted that she had his will "fixed like I want it," and he had stated that she and her son wanted everything he had though he had other children who should be taken care of. Gay v. Gay, 308 Ky. 539, 215 S. W. 2d 92, is of the same character. Those cases are far removed from the present one when it comes to applying the law to the facts.

We are of the opinion that the court should have directed the jury to find the instrument to be the will of the decedent.

Judgment reversed.