Mary Ruth BYE, Appellant,

v.

Sylvia Ann MATTINGLY, Successor Administratrix Cum, Testamento Annexo, of the Estate of William Louis McQuady, Richard Keith McQuady, and Acracia G. Beavin, Appellees.

No. 97–SC–208–DG.

Supreme Court of Kentucky.

Sept. 8, 1998.

O. Grant Bruton, Louisville, Kentucky, for appellant.

Kenton R. Smith, Steven R. Crebessa, Brandenburg, Kentucky, for appellees.

STEPHENS, Chief Justice.

The testator, William Louis McQuady, and Alberta Beavin McQuady were married for forty-five years prior to Ms. McQuady's death on March 23, 1989. In October of 1988, the McQuadys executed identical wills

which left the surviving spouse in possession of the entire estate. In the event that there was no surviving spouse, all realty was to pass to Richard Keith McQuady, a second cousin once removed to William McQuady, and all personalty was to pass to Samuel Thomas Beavin, brother of Alberta Beavin McQuady. Accordingly, on Ms. McQuady's death, the entire estate passed to Mr. McQuady.

Following his wife's death, Mr. McQuady retained Mary Ruth Bye, appellant in this matter, to act as his housekeeper. Mr. McQuady was unable to see and required assistance to overcome this disability. During their marriage, Ms. McQuady had performed all tasks related to maintaining the household and Ms. Bye was to perform these tasks as part of her duties. Ms. Bye assumed her position as housekeeper in May of 1989.

On July 17, 1989, Mr. McQuady, accompanied by Ms. Bye, visited Herbert O'Reilly of Hardinsburg who had drafted the 1988 wills the McQuadys had executed. Mr. McQuady executed a new will that left his entire estate, save a hundred dollar bequest to St. Mary of the Woods Church, to Ms. Bye.

Subsequent to the execution of the 1989 will, Ms. Bye arranged for a garage to be constructed on Mr. McQuady's property. Following completion of the garage Mr. McQuady's car was never actually stored in the garage. However, at trial Ms. Bye testified that her car was periodically parked inside the garage. The relevance of this event was that it sparked concern in Mr. Beavin and Mr. Richard McQuady with regard to the use of Mr. William McQuady's money by Ms. Bye. The construction of the garage concerned Mr. Beavin and Richard McQuady as the McQuadys had lived in a frugal fashion during their forty-five year relationship and Mr. McQuady possessed an older automobile which had never been garaged in the past.

On May 18, 1990, the petition of Mr. Beavin and Mr. Richard McQuady to appoint a guardian/conservator for William McQuady was heard. As a result of that hearing the Breckinridge District Court appointed Mr. Beavin as a Limited Conservator and Limited Guardian for Mr. McQuady. Following the hearing, Mr. McQuady's health declined and he was admitted to the hospital on September 21, 1990. Mr. McQuady was diagnosed as suffering from Alzheimer's disease. It should be noted that the effects of Alzheimer's disease can be accentuated by poor health and/or poor treatment.

After Mr. McQuady was diagnosed with Alzheimer's disease, a petition seeking to permit Mr. McQuady to marry Ms. Bye was filed with the Breckinridge District Court. On May 17, 1991, a hearing was held in Breckinridge District Court to determine whether the petition of William McQuady to marry Ms. Bye should be granted. At that hearing Mr. McQuady testified that although he had signed the petition, he was misled in regard to the nature of the document. Mr. McQuady stated that he was told by the Byes not to worry about it and just sign it. The document was prepared by Ellen Bye, daughter of appellant.

During the course of this hearing, Mr. McQuady emphatically stated that he did not want to get married to Ms. Bye. He also stated that he was afraid of Ms. Bye. The court denied the petition to marry. Ms. Bye's services as housekeeper were subsequently terminated.

Five months after the hearing on the petition to marry, Mr. McQuady executed a new will. The net effect of the will executed October 29, 1991, was to re-enact the will he had executed in 1988, in effect leaving his personalty to Mr. Beavin and his realty to Mr. Richard McQuady. The 1991 will was drafted by Alton Cannon and was executed in his office. Richard McQuady drove William McQuady to Mr. Cannon's Law Offices, but Richard McQuady never participated in any discussion or activities regarding the will. William McQuady and Mr. Cannon privately discussed the will that Mr. McQuady desired. When the will was actually executed Mr. Cannon, Mrs. Sheila Cannon and William McQuady were the only three persons present.

On August 7, 1992, William McQuady died. Mr. Beavin was appointed executor of McQuady's estate. Appellant then brought

the instant action, challenging the validity of the 1991 will on grounds of undue influence and lack of testamentary capacity. Mr. Beavin died on October 5, 1993 and Sylvia Mattingly, Mr. Beavin's daughter, was appointed by the Breckinridge Circuit Court to serve as a party-defendant in place of Mr. Beavin in his capacity as executor.

Following a five day trial, a jury returned a unanimous verdict for appellees. During the course of the trial Judge Samuel Monarch, a sitting judge on the Breckinridge Circuit Court, was called by appellees to testify as a witness. Judge Monarch had not been listed by appellees on their witness list. Judge Monarch testified as to the honesty and veracity of his former partner in legal practice, Alton Cannon. Appellants appealed the verdict to the Court of Appeals. A divided panel upheld the trial court. *Bye v. Mattingly,* Ky.App., 97–CA–1874–MR (Sept. 20, 1996). This Court granted discretionary review. We now affirm the Court of Appeals.

There are several issues which the parties have brought before this Court. First, whether a partial disability judgment against an individual removes that person's testamentary capacity. Second, whether a partial disability judgment creates a presumption that a testator lacks testamentary capacity. Third, whether a fiduciary relationship between a limited conservator/guardian and his ward creates a burden on the limited conservator/guardian to demonstrate the non-existence of undue influence. Fourth, whether it is proper for a circuit judge who sits in the same court as the instant trial to testify as a character witness. We shall respond to each of these issues in turn.

## I. JUDGMENT OF DISABILITY PURSUANT TO KRS 387.500 ET SEQ. AND TESTAMENTARY CAPACITY.

On July 9, 1990, pursuant to KRS 387.500 *et seq.,* William McQuady was adjudged partially disabled in the Breckinridge District Court. Appellants urge this Court to rule that the effect of such judgment was to remove McQuady's capacity to draft a will or in the alternative that a presumption against testamentary capacity was created by

the judgment. We decline to make either such ruling.

In Kentucky there is a strong presumption in favor of a testator possessing adequate testamentary capacity. This presumption can only be rebutted by the strongest showing of incapacity. *Williams v. Vollman,* Ky.App., 738 S.W.2d 849 (1987); *Taylor v. Kennedy,* Ky .App., 700 S.W.2d 415, 416 (1985). Testamentary capacity is only relevant at the time of execution of a will. *New v. Creamer,* Ky., 275 S.W.2d 918 (1955). Thus any order purporting to render a person per se unable to dispose of property by will is void *ab initio,* as such a ruling on testamentary capacity would be premature. This is not to say that such an order is irrelevant, but rather it is not dispositive of the issue of testamentary capacity.

"Kentucky is committed to the doctrine of testatorial absolutism ." J. Merritt, 1 Ky.Prac.—Probate Practice & Procedure, § 367 (Merritt 2d ed. West 1984). *See New v. Creamer,* Ky., 275 S.W.2d 918 (1955); *Jackson's Ex'r v. Semones,* 266 Ky. 352, 98 S.W.2d 505 (1937). The practical effect of this doctrine is that the privilege of the citizens of the Commonwealth to draft wills to dispose of their property is zealously guarded by the courts and will not be disturbed based on remote or speculative evidence. *American National Bank & Trust Co. v. Penner,* Ky., 444 S.W.2d 751 (1969). The degree of mental capacity required to make a will is minimal. *Nance v. Veazey,* Ky., 312 S.W.2d 350, 354 (1958). The minimum level of mental capacity required to make a will is less than that necessary to make a deed, *Creason v. Creason,* Ky., 392 S.W.2d 69 (1965), or a contract. *Warnick v. Childers,* Ky., 282 S.W.2d 608 (1955).

To validly execute a will, a testator must: (1) know the natural objects of her bounty; (2) know her obligations to them; (3) know the character and value of her estate; and (4) dispose of her estate according to her own fixed purpose. *Adams v. Calia,* Ky., 433 S.W.2d 661 (1968); *Waggener v. General Ass'n of Baptists,* Ky., 306 S.W.2d 271 (1957); *Burke v. Burke,* Ky.App., 801

S.W.2d 691 (1990); *Fischer v. Heckerman,* Ky.App., 772 S.W.2d 642 (1989). Merely being an older person, possessing a failing memory, momentary forgetfulness, weakness of mental powers or lack of strict coherence in conversation does not render one incapable of validly executing a will. *Ward v. Norton,* Ky., 385 S.W.2d 193 (1964). "Every man possessing the requisite mental powers may dispose of his property by will in any way he may desire, and a jury will not be permitted to overthrow it, and to make a will for him to accord with their ideas of justice and propriety." *Burke v. Burke,* Ky.App., 801 S.W.2d 691, 693 (1991) (*citing Cecil's Ex'rs. v. Anhier,* 176 Ky. 198, 195 S.W. 837, 846 (1917)).

■ In the instant case Mr. McQuady executed wills in 1988, 1989 and 1991. Appellant seeks to have the 1991 will declared invalid as it was executed following the 1990 adjudgment of partial incapacity. While a ruling of total or partial disability certainly is evidence of a lack of testamentary capacity, it is certainly not dispositive of the issue. This Court has upheld the rights of those afflicted with a variety of illnesses to execute valid wills. *Tate v. Tate's Ex'r,* Ky., 275 S.W.2d 597 (1955) (testator suffered deafness and retarded speech); *Bush v. Lisle,* 89 Ky. 393, 12 S.W. 762 (1889) (testator was blind); *In re: McDaniel's Will,* 25 Ky. 331 (1829) (testator was paralyzed); *Bodine v. Bodine,* 241 Ky. 706, 44 S.W.2d 840 (1932)(testator was an epileptic). We have not disturbed the testatorial privileges of those who believed in witchcraft[1], spiritualism[2] or atheism.[3] While none of these cases absolutely parallels the instant case, we recite them here to demonstrate how this Court has always taken the broadest possible view of who may execute a will no matter what their infirmity.

■ When a testator is suffering from a mental illness which ebbs and flows in terms of its effect on the testator's mental competence, it is presumed that the testator was mentally fit when the will was executed.

This is commonly referred to as the lucid interval doctrine. *Warnick v. Childers,* Ky., 282 S.W.2d 608, 609 (1955); *Pfuelb v. Pfuelb,* 275 Ky. 588, 122 S.W.2d 128 (1938). See *In re Weir's Will,* 39 Ky. 434 (1840); *Watts v. Bullock,* 11 Ky. 252 (1822). Alzheimer's is a disease that is variable in its effect on a person over time. It is precisely this type of illness with which the lucid interval doctrine was designed to deal. By employing this doctrine, citizens of the Commonwealth who suffer from a debilitating mental condition are still able to dispose of their property.

■ The lucid interval doctrine is only implicated when there is evidence that a testator is suffering from a mental illness; otherwise the normal presumption in favor of testamentary capacity is operating. The burden is placed upon those who seek to overturn the will to demonstrate the lack of capacity. *Warnick,* 282 S.W.2d at 609; *Pfuelb,* 275 Ky. at 588, 122 S.W.2d at 128. The presumption created is a rebuttable one, so that evidence which demonstrates conclusively that the testator lacked testamentary capacity at the time of the execution of the will results in nullifying that will.

In the present case there is no question that Mr. McQuady suffered from Alzheimers disease. However, under the doctrine he is presumed to have been experiencing a lucid interval during the execution of the will. The wisdom of this doctrine is demonstrated by Mr. McQuady's testimony during the hearing on the petition for marriage in Breckinridge District court. During that hearing Mr. McQuady was very lucid and demonstrated a complete grasp of the circumstances in which he found himself. Appellant has failed to offer this Court evidence which demonstrates that the testator did not have a lucid interval during which he executed the 1991 will. In sum, let it suffice to say that in the instant case a presumption of a lucid interval of testamentary capacity was appropriate.

1. *Schildnecht v. Rompf's Ex'x,* 9 Ky.Law Rep. 120, 4 S.W. 235 (1887)

2. *Compton v. Smith,* 286 Ky. 179, 150 S.W.2d 657 (1941).

3. *Woodruff's Ex'r v. Woodruff,* 233 Ky. 744, 26 S.W.2d 751 (1930).

Given this Court's consistent attitude toward the virtually absolute right of the citizens of the Commonwealth to make wills, it would be incongruous for us now to announce a new rule of law which restricted these rights which we have held in such high regard for so long. While the clear policy of the Commonwealth is that our citizens who are no longer able to fully care for themselves must be protected from the various societal predators, we will restrict their testamentary rights only when it is absolutely necessary and even then only to the degree required to defend their interests.

## II. FIDUCIARY RELATIONSHIPS AND THE PRESUMPTION OF UNDUE INFLUENCE.

 Undue influence is a level of persuasion which destroys the testator's free will and replaces it with the desires of the influencer. *Nunn v. Williams,* Ky., 254 S.W.2d 698, 700 (1953); *Williams v. Vollman,* Ky. App., 738 S.W.2d 849, 850 (1987). In discerning whether influence on a given testator is "undue", courts must examine both the nature and the extent of the influence. First, the influence must be of a type which is inappropriate. Influence from acts of kindness, appeals to feeling, or arguments addressed to the understanding of the testator are permissible. *Nunn,* 254 S.W.2d at 700; *Fischer v. Heckerman,* Ky.App., 772 S.W.2d 642, 645 (1989). Influence from threats, coercion and the like are improper and not permitted by the law. *Lucas v. Cannon,* 76 Ky. 650 (1878). Second, the influence must be of a level that vitiates the testator's own free will so that the testator is disposing of her property in a manner that she would otherwise refuse to do. *See v. See,* Ky., 293 S.W.2d 225 (1956); *Rough v. Johnson,* Ky., 274 S.W.2d 376 (1955). The essence of this inquiry is whether the testator is exercising her own judgment. *Mayhew v. Mayhew,* Ky., 329 S.W.2d 72 (1959); *Copley v. Craft,* Ky., 312 S.W.2d 899 (1958).

 In addition to demonstrating that undue influence was exercised upon the testator, a contestant must also show influence prior to or during the execution of the will. Undue influence exercised after the execu-

tion of the will has no bearing whatsoever upon whether the testator disposed of her property according to her own wishes. *Bennett v. Bennett,* Ky., 455 S.W.2d 580 (1970); *Wallace v. Scott,* Ky.App., 844 S.W.2d 439 (1992); *Fischer v. Heckerman,* Ky.App., 772 S.W.2d 642 (1989). The influence must operate upon the testator at the execution of the will. If the influence did not affect the testator, then such conduct is irrelevant. *Bodine v. Bodine,* 241 Ky. 706, 44 S.W.2d 840 (1932); *Walls v. Walls,* 30 Ky.Law Rep. 948, 99 S.W. 969 (1907). However, even if the influence occurred many years prior to the execution of the will, but operates upon the testator at the time of execution, it is improper and will render the will null and void. *Id.*

 To determine whether a will reflects the wishes of the testator, the court must examine the indicia or badges of undue influence. Such badges include a physically weak and mentally impaired testator, a will which is unnatural in its provisions, a recently developed and comparatively short period of close relationship between the testator and principal beneficiary, participation by the principal beneficiary in the preparation of the will, possession of the will by the principal beneficiary after it was reduced to writing, efforts by the principal beneficiary to restrict contacts between the testator and the natural objects of his bounty, and absolute control of testator's business affairs. *Belcher v. Somerville,* Ky., 413 S.W.2d 620 (1967); *Golladay v. Golladay,* Ky., 287 S.W.2d 904, 906 (1955).

Applying these badges to the 1991 will, it is clear that no undue influence was present. Given the fact that a partial disability order was in place when the will was executed, there is no question that the testator was physically and mentally weak. Similarly, since a disability order was in place, Mr. Beavin had complete control of the testator's business affairs. However, none of the other badges are present with respect to the 1991 will.

 When a contestant seeks to claim that undue influence was employed upon a testator, the burden is upon the contestant to demonstrate the existence and effect of the influence. *Nunn v. Williams,* Ky., 254

S.W.2d 698, 700 (1953). Merely demonstrating that the opportunity to exert such influence is not sufficient to sustain the burden of proof. *Id.* When undue influence and a mentally impaired testator are both alleged and the mental impairment of the testator is proven, the level of undue influence which must be shown is less than would normally be required since the testator is in a weakened state. *Creason v. Creason,* Ky., 392 S.W.2d 69 (1965); *Sloan v. Sloan,* 303 Ky. 180, 197 S.W.2d 77, 80 (1946).

 In Kentucky no presumption of undue influence arises from a bequest by a testator who has a confidential relationship with the beneficiary. *Palmer v. Richardson,* 311 Ky. 190, 197, 223 S.W.2d 745, 749–50 (1949); *McAtee v. McAtee,* 297 Ky. 865, 874, 181 S.W.2d 401, 405 (1944); *Kiefer's Ex'r v. Deibel,* 292 Ky. 318, 166 S.W.2d 430, 433–34 (1942); 1 Ky. Prac.—Probate Practice & Procedure, § 555 (Merritt 2d ed.1984). There is no question when a testator who has a confidential relationship with one who receives a benefit under a will, such a transaction should certainly be examined and placed into evidence before the jury, but no presumption of wrongdoing is created. In fact, it is not uncommon or inappropriate for a testator to make such a bequest to one who has provided comfort and support to the testator. *Ecken's Ex'x v. Abbey,* 283 Ky. 449, 141 S.W.2d 863 (1940); *Karr v. Karr's Ex'r,* 283 Ky. 355, 141 S.W.2d 279 (1940).

 We wish to note that in making this ruling we are not disturbing the well-settled rule that a contract between a guardian and ward does indeed create a presumption against the transaction which must be rebutted by the guardian with clear and convincing evidence. *Meade v. Fullerton's Adm'x,* 266 Ky. 34, 98 S.W.2d 1, 2 (1936). The distinction between a bequest in a will and a transaction between two parties is that a will gift does not involve conflicting interests. However, in a transaction, the parties are placed in an adversarial relationship in which each party is attempting to maximize his or her own benefit without regard to the other. Accordingly, all contracts between a ward and guardian are due a much higher level of

scrutiny and thus the presumption against them is created.

 Accordingly, since no presumption against the validity of the 1991 will exists, the burden was on the appellant to show that the 1991 will was procured through undue influence. A jury unanimously found that the 1991 will was not procured by undue influence. Nothing appellant has offered this Court even comes close to rising to the level necessary to set the jury's verdict aside. This Court is particularly disinclined to set aside a jury's decision in which it has found a will to be valid. *Rodgers v. Cheshire,* Ky., 421 S.W.2d 599 (1967).

Appellant's argument, based on the idea that because the testator had been adjudicated as mentally infirm, he was more susceptible to undue influence, is indeed an interesting one. However, for some reason appellant urges this Court not to examine the 1989 will, procured under suspicious circumstances (under which she benefitted) but rather only apply its undue influence analysis to the 1991 will. We decline her invitation to do so. If testator was in a mentally feeble condition in July of 1990, then it is certainly possible—in fact likely—that he was in a similar condition one year earlier when he willed his entire estate to appellant. We find appellant's argument unpersuasive. However, as we find no undue influence in the execution of the 1991 will, we have no occasion to fully review the circumstances surrounding the enactment of the 1989 will.

 There is a presumption which has some potential application to the instant case. In those instances in which a will is grossly unreasonable and the principal beneficiary actively participated in its execution, a presumption of undue influence arises. *Hollon's Ex'r v. Graham,* Ky., 280 S.W.2d 544 (1955); *Gay v. Gay,* 308 Ky. 539, 215 S.W.2d 92 (1948). If the contestant can offer evidence of such activities, then the burden of persuasion shifts to the proponents of the will, but it does not relieve the contestants of the continuing burden of proof. *Gay,* 308 Ky. at 539, 215 S.W.2d at 92; *Kiefer's Ex'r v. Deibel,* 292 Ky. 318, 166 S.W.2d 430 (1942).

The executions of the 1989 and 1991 wills are virtually identical in their facts. In 1989, Ms. Bye drove the testator to a lawyer and Ms. Bye was not privy to the drafting nor execution of the will. Following the execution ritual, Ms. Bye drove the testator home. In 1991, the same circumstance was repeated with Mr. Beavin driving testator to and from the lawyer's offices. Under neither of these circumstances can we say that Ms. Bye nor Mr. Beavin actively participated in the execution of the respective wills. Accordingly, this presumption does not apply in the instant case.

## III. APPEARANCE OF SITTING CIRCUIT JUDGE AS A WITNESS AT TRIAL IN HIS OWN COURTHOUSE.

During the course of the trial, appellant sought to discredit the 1991 will by discrediting its drafter, Alton Cannon. Appellant now complains that she was unfairly surprised when appellees were permitted to call Circuit Judge Samuel Monarch, who sits in the Breckinridge Circuit Court where this case was tried, as a character witness to rebut appellant's attacks on Mr. Cannon. Appellant asserts, *inter alia*, that it was improper for Judge Monarch to be permitted to testify as a witness in the very courthouse in which he was then sitting as a Circuit Judge. Appellant further complains that he had presided over the same panel of veniremen and at least two of the jurors had been jurors in a previous trial which Judge Monarch had conducted. It should be noted that Judge Monarch recused himself from participating in the instant case due to his previous relationship with Alton Cannon.

Obviously it is preferable that a sitting jurist never be called upon to testify in a trial, particularly within the jurisdiction over which he presides and very particularly in front of a panel of veniremen over which he originally presided. While this Court does not agree with appellant's characterization of appellees conduct as the "ultimate Home Cookin'" ploy, we are in general agreement that this was a very unfortunate situation which should be avoided whenever possible. However, we find singularly uncompelling appellant's argument that she was "blindsided" by Judge Monarch's surprise appearance, particularly after she placed Mr. Cannon's credibility in issue in the first place.

As the trial record clearly reflects, appellant decided to attempt to denigrate Mr. Cannon's reputation in an attempt to cast the execution of the 1991 will into doubt. This was a perfectly permissible trial strategy. However, appellant cannot now speak out of the other side of her mouth and say that she had no idea that a character witness might be called to rebut her assault. Appellees are under no obligation to warn appellant of their possible response to appellant's every conceivable course of action.

Under Canon 2(b) of the Code of Judicial Conduct, codified at SCR 4.300, a "judge should not ... testify voluntarily as a character witness." Judge Monarch was served with a subpoena by appellees. Accordingly, he did not testify voluntarily within the meaning of Canon 2(b). Since Judge Monarch's testimony was permissible, given its relative brevity and limited scope, any error which may have occurred was certainly harmless.

Accordingly, for the foregoing reasons the judgment of the Court of Appeals is affirmed.

COOPER, GRAVES, JOHNSTONE, LAMBERT and STUMBO, JJ., concur.

WINTERSHEIMER, J., concurs in result only.